Frank J. OSTROFE, Plaintiff-Appellant,

v.

H.S. CROCKER COMPANY, INC., Defendant-Appellee.

No. 77–3985.

United States Court of Appeals, Ninth Circuit.

Aug. 15, 1984.

Darrell J. Salomon, Alioto & Alioto, San Francisco, Cal., for plaintiff-appellant.

James T. Fousekis, Steinhart & Falconer, San Francisco, Cal., for defendant-appellee.

Before BROWNING, Chief Judge, KENNEDY and SKOPIL, Circuit Judges.

BROWNING, Chief Judge:

Plaintiff brought this suit under Section 4 of the Clayton Act to recover treble damages for injuries resulting from a violation of the Sherman Antitrust Act. The district court dismissed a part of plaintiff's claim for lack of standing to sue under Section 4, and granted summary judgment as to the remainder. We reversed. *Ostrofe I*, 670 F.2d 1378 (9th Cir.1982). The Supreme Court vacated our judgment and remanded for further consideration in light of *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). *See* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983).

We first summarize the holding in *Associated General Contractors*, then recount the facts in *Ostrofe*, and finally consider the three bases on which we held Ostrofe had standing: (1) as a victim of a boycott in the market for personal services; (2) as a victim of a boycott to effectuate a price fixing conspiracy in the labels market; and (3) as a victim of a unilateral discharge by one of the conspirators in furtherance of the price fixing conspiracy. We note that *Associated General Contractors* did not address the first basis for standing, but conclude that Ostrofe clearly has standing on this basis in light of the determinative factors stated by the Supreme Court. Reexamining our finding of standing on the other two bases in light of *Associated General Contractors*, we conclude that Ostrofe also has standing both as a direct boycott victim who has sustained antitrust injury from the labels market conspiracy, and in

the alternative, if antitrust injury is construed narrowly, as a direct victim of a boycott undertaken as a means to accomplish the purpose of the price fixing conspiracy in the labels market—a case the Court specifically reserved.

## I.

### Associated General Contractors v. California State Council of Carpenters

*Associated General Contractors* deals only with the issue of standing to sue under Section 4. A union of carpenters and other construction workers brought suit under the antitrust laws against a group of building and construction contractors. The complaint alleged the defendants had restrained competition in the market for construction contracting by coercing landowners and others to enter into construction contracts with non-union contractors and subcontractors. This allegedly reduced the business of union contractors and subcontractors which, in turn, diminished the business activities of plaintiff union.

The Court held that not all parties who suffer consequential harm have standing to sue for antitrust damages, even if the harm is intentional. It did not, however, announce a new test for determining whether a party injured by an antitrust violation could recover treble damages. Rather, the principal message of the case is that it is "virtually impossible to announce a black-letter rule that will dictate a result in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Associated General Contractors*, 103 S.Ct. at 907–08. The Court enumerated these factors, drawing largely upon its previous decisions and those of this and other courts of appeals. The factors to be considered, according to the Court, include the nature of the injury in relation to the purpose of the antitrust laws, the directness of the injury, and the potential for duplicative recovery or complex apportionment of damages. *Id.* at 908–13. The plaintiff union in *Associated*

*General Contractors* satisfied the causal connection and intentional harm factors set forth by the Supreme Court, but the Court concluded that on balance the other relevant considerations "weigh[ed] heavily against judicial enforcement of the Union's antitrust claim." *Id.* at 913.

The Court focused on the nature of plaintiff's injury in relation to the purpose of the Sherman Act: assuring competition and protecting the economic freedom of participants in the relevant market, citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) and *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *Associated General Contractors,* 103 S.Ct. at 908–09.

The union's claims arose from alleged restraints caused by defendant in the market for construction contracting. *Id.* at 903. The Court noted the union was neither a consumer nor competitor in that market, and it was unclear whether its interests—improving wages and working conditions—would be helped or hurt if competition in that market were enhanced. *Id.* at 909.

The injury to the union was only indirect, allegedly resulting from the injury to the direct victims of the conspiracy—the union contractors who lost business because of coercion directed against builders to compel them to deal with non-union contractors. *Id.* at 910. The existence of direct victims of the antitrust violation diminished the justification for affording standing to a more remote party such as the union. *Id.* at 911. Denying the union standing was unlikely to leave a significant antitrust violation undetected or unremedied. *Id.* The union's damages were highly speculative, and any attempt to assess them would have involved a danger of duplicative recovery among the several layers of victims. *Id.* at 911–12.

## II.

### Ostrofe v. H.S. Crocker Company

Frank J. Ostrofe, former marketing director of H.S. Crocker, Inc., filed suit

against Crocker for damages for injuries resulting from a violation of the Sherman Act. The complaint alleged that Crocker and other manufacturers of paper lithograph labels conspired to restrain interstate trade and commerce in such labels in violation of Section 1 of the Act, 15 U.S.C. § 1 (1976), and that the conspiracy was effectuated in part by coercing Ostrofe, as Crocker's sales manager, to rig bids, fix prices, and allocate markets. Ostrofe violated the agreement by competing freely for business. Crocker's co-conspirators complained to Crocker's executive officers, who in turn warned Ostrofe to cooperate. Ostrofe refused. He was forced to resign from his job as Crocker's sales manager and alleged he was boycotted from further employment in the industry.

Crocker moved to dismiss for lack of standing under Section 4. The district court granted the motion in part, holding that Ostrofe lacked standing to attack the alleged conspiracy to restrain competition in the sale of labels, of which the agreement to terminate and boycott Ostrofe was allegedly a part. The Court rejected Ostrofe's motion to amend the complaint to allege that his termination was a unilateral act undertaken by Crocker to effectuate the conspiracy. In the Court's view, such an amendment would have allowed Ostrofe to prove the price fixing conspiracy in establishing Crocker's unlawful purpose, contrary to the court's ruling that Ostrofe lacked standing to challenge that conspiracy.

The district court also denied the motion to dismiss in part, holding that Ostrofe had standing to challenge the agreement to bar him from employment. Crocker moved for summary judgment, claiming that as a matter of law Ostrofe is not entitled to prevail because he did not apply for a job with Crocker or any other label manufacturer. Ostrofe countered with an affidavit asserting it would have been futile for him to seek employment with any firm in the industry, reciting in support of this conclusion the dealings he had had with Crocker and the other label manufacturers while they were attempting to effectuate the price fixing scheme and the threats directed against him for not cooperating. The district court granted Crocker's motion for summary judgment without opinion and dismissed the action. See Ostrofe I, 670 F.2d at 1380.

Thus the appeal to this court presented two basic issues: (1) whether summary judgment was properly granted against Ostrofe as to the alleged agreement to deny him employment, and (2) whether Ostrofe had standing to challenge the price fixing conspiracy as the victim either of an alleged boycott or of the unilateral act of a single conspirator to effectuate the conspiracy. We held (1) that summary judgment as to the alleged boycott was improperly granted, and (2) that Ostrofe had standing to challenge the price fixing conspiracy on either factual premise.

### III.

### Restraint of Competition in the Market for Services

We first consider Ostrofe's standing with respect to his suit against Crocker based on an implied agreement among label manufacturers to discharge him and interfere with his opportunity for re-employment in the labels industry.

The Supreme Court expressly distinguished this aspect of the present case from the case presented in *Associated General Contractors*, pointing out that the injuries suffered by the union in *Associated General Contractors* arose from alleged restraints in the market for construction contracting and thus were derivative, and that the union did "not allege any restraint on competition in the market for labor union services." 103 S.Ct. at 903 and n. 14.

■ We conclude that Ostrofe clearly satisfied the standards for standing set forth in *Associated General Contractors* with respect to this aspect of his claim. His alleged injury was caused by the boycott, it was intentionally inflicted, and it was direct. His injury flowed from a violation of antitrust policy, since it resulted

from the elimination of competition in the market for managerial services and would be ameliorated by the restoration of competition in that market. His injury was "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' actions unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). As the immediate victim of the breach of antitrust policy he was its natural vindicator. No one else had a greater incentive to sue to restore competition in the market for his services. As a victim of an alleged boycott, Ostrofe "is entitled to an opportunity to prove his charges." *Radovich v. National Football League*, 352 U.S. 445, 454, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957).

▪ The district court allowed Ostrofe standing to challenge the boycott but granted Crocker's motion for summary judgment on this issue. The court's ruling apparently rested on two grounds, both contrary to law. The district court held Ostrofe could not offer as proof of the existence of the boycott evidence of the price-fixing scheme, his refusal to cooperate, and the complaints and threats against him because of his refusal. Evidence of the price-fixing scheme was clearly probative of the existence of the boycott; one grew out of the other. *Ostrofe I,* 670 F.2d at 1388–89; *cf. Radovich,* 352 U.S. at 448–49, 77 S.Ct. at 392–93 (complaint alleged "[t]he black-listing was the result of a conspiracy ... to monopolize commerce in professional football"). As we said in our first opinion:

> In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each "... [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."

*Ostrofe I,* 670 F.2d at 1381 (*quoting Continental Ore Co. v. Union Carbide & Carbon Corporation,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)).

▪ The district court's second possible ground for granting summary judgment on the boycott issue is reflected in Crocker's argument that existence of a demand for employment, admittedly lacking here, was required to make out a cause of action for concerted refusal to deal. *See Cleary v. National Distillers and Chemical Corp.,* 505 F.2d 695, 697 (9th Cir.1974). *Ostrofe I,* 670 F.2d at 1388 n. 29. Even if this were the rule, it would be subject to an exception when a demand for employment "amounts to a futile gesture which the law does not require." *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 377 F.2d 776, 781 (3d Cir.1967). The Supreme Court explicitly affirmed the Third Circuit in this respect, stating, "We also agree with the courts below that in the circumstances of this case it was unnecessary for Hanover to prove an implicit demand during the damage period." 392 U.S. 481 at 487 n. 5, 88 S.Ct. 2224, 2228 n. 5, 20 L.Ed.2d 1231. Summary judgment was therefore inappropriate on this ground because, as we pointed out in our first opinion, "[T]here was a disputed issue of fact as to whether a demand would have been futile." *Ostrofe I,* 670 F.2d at 1388 n. 29.

A request or demand is not always necessary to establish injury from a boycott in an antitrust suit. A boycott injuring plaintiff may be proven by other evidence. As the Supreme Court said in reversing this court in *Continental Ore,* "we do not believe liability under the antitrust laws can be measured by any rigid or mechanical formula requiring Continental both to demand materials from respondents and to exhaust all other sources of supply." 370 U.S. at 699, 82 S.Ct. at 1410.

*Cleary* is not to the contrary. We were dealing there with the sufficiency of the evidence to support a claim of boycott. We concluded that "appellant's evidence, taken as a whole, is insufficient." 505 F.2d at 696. In the course of considering the evidence in that case we said a demand and refusal were necessary, but clarified our

meaning in the next sentence: "A plaintiff can have no relief when his failure to obtain a desired product is attributable to his own failure to make a request." What *Cleary* requires is not a demand in every case but rather the production of sufficient evidence to show the plaintiff was denied the product (in this case, employment) by an agreement or concert of action among the defendants to deny it to him. Even if *Cleary* were read as stating that a demand is generally necessary, nothing in the opinion purports to bar an exception where failure to obtain the product is not attributable to a failure to make a request—where, for example, such a demand would be futile, an exception required by *Hanover Shoe.*

## IV.

### *Restraint on Competition in the Market for Labels*

■ We next consider the impact of *Associated General Contractors* on our holding that Ostrofe has standing to challenge the conspiracy to fix prices and allocate sales in the market for labels.

This question was presented on two different factual assumptions: first, that Ostrofe was the victim of a boycott agreed to by the conspirators for the purpose of effectuating the restraint on competition in the labels market, as alleged in the complaint; and second, that Ostrofe was the victim of a unilateral act by Crocker undertaken with the same purpose, as alleged in Ostrofe's proposed amendment.

In our earlier opinion we held that as a direct victim of a boycott agreed to as a means to effectuate the conspiracy to eliminate competition in the labels market, Ostrofe could challenge the conspiracy even though his injury did not result from the reduction of competition in the sale of labels. Relying primarily on *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), we said that "persons injured by an agreed-upon refusal to deal employed as a part of a conspiracy to restrain or monopolize trade and commerce have been permitted to challenge the conspiracy as a whole even though their injuries did not result from the restraint on competition that was the principal object of the conspiracy." *Ostrofe I*, 670 F.2d at 1382.

The reasons for sustaining standing by one whose injury results from the unilateral action of one conspirator in furtherance of the conspiracy are stated at some length in our earlier opinion. *See id.* at 1382–88. They are essentially the same as those sustaining standing when the discharge results from concerted action in furtherance of the unlawful purpose. We read nothing in *Associated General Contractors* that would make Ostrofe's standing to sue Crocker for its wrongful act under Section 4 depend on whether Crocker's discharge of Ostrofe was a unilateral act pursuant to the conspiracy or an act agreed upon by the conspirators. Since only Crocker is sued, no question is raised as to any right to collect damages from non-acting conspirators.

We conclude that *Associated General Contractors* does not require a change in our decision that, on either hypothesis, Ostrofe has standing to redress the injury he suffered as a result of the labels market conspiracy. We reach this conclusion for two reasons: (1) *Associated General Contractors*, read in light of *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), leads us to believe that Ostrofe sustained "antitrust injury" and, as such, was a proper plaintiff; (2) if, however, this construes "antitrust injury" more broadly than the Court intended, *Associated General Contractors* does not dictate reversal since it reserved the question of standing for a person who does not suffer "antitrust injury" in the technical sense but is the direct victim of conduct undertaken to accomplish the anticompetitive practice of an antitrust conspiracy. Examining the factors *Associated General Contractors* directed us to consider, we conclude that such a plaintiff should be allowed to sue under section 4.

## A.

The Court's decision in *Blue Shield,* filed after our decision in *Ostrofe,* suggests that Ostrofe did in fact sustain antitrust injury. McCready, a member of a group health plan, sued her insurer for damages under Section 4. The insurer had entered into a conspiracy with psychiatrists to restrain competition in the psychotherapy market. The means used by the conspirators was excluding and boycotting clinical psychologists from receiving compensation under Blue Shield health plans. Pursuant to the conspiracy, Blue Shield refused to pay McCready's claim for reimbursement of the cost of treatment by a psychologist. The court rejected the argument that because the conspiracy was directed against psychologists rather than against subscribers to health plans like McCready, the injury to McCready was too "remote" to permit suit. The court did so on the ground that denial of reimbursement to patients of psychologists was "the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready ... was a necessary step in effecting the ends of the alleged illegal conspiracy" and an "integral ... aspect of the conspiracy alleged." 457 U.S. at 479, 102 S.Ct. at 2549.

The Court also rejected the argument, based on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), that recovery was barred because McCready did not allege that the restraint on competition in the market for psychotherapeutic services had caused her to pay more for such services. The Supreme Court agreed that *Brunswick* "embrace[d] the general principle that treble-damages recoveries should be linked to the procompetition policy of the antitrust laws," but specifically rejected the conclusion that therefore only injuries that reflect the anticompetitive effect of the violation were compensable under the antitrust laws. *Blue Shield,* 457 U.S. at 482, 102 S.Ct. at 2550. The Court held McCready was entitled to sue because Blue Shield was charged with "a purposefully *anti-competitive scheme,"* and the injury McCready suffered "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 483–84, 102 S.Ct. at 2550–51. (emphasis in original).

The rationale of *Blue Shield* favors Ostrofe's right to sue. The Court's refusal to limit recovery to those whose injuries resulted from the anti-competitive effect of the violation undercuts conceptual objections to allowing suit by an employee discharged for refusing to effectuate an antitrust violation. The Court's extension of the right to sue to persons whose injury is a "necessary step" and the "means" employed by the conspirators to achieve their anticompetitive end provides a principled basis for recognizing Ostrofe's right to sue.

The Court provided an illustration of this principle in the form of a hypothetical:

> If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions. And plainly, in evaluating the reasonableness under the antitrust laws of the psychiatrists' conduct, we would be concerned with its effects not only on the business of banking, but also on the business of the psychologists against whom that secondary boycott was directed.

457 U.S. at 484 n. 21, 102 S.Ct. at 2551 n. 21. Ostrofe's status is in many respects similar to that of the bank, which—according to the Court—was similar to that of McCready. *Id.* The discharge of Ostrofe furthered the anticompetitive scheme in the labels market, just as the boycott of the bank furthered the anticompetitive scheme in the psychotherapy market. Neither the bank nor Ostrofe was a competitor or consumer in those markets. Nevertheless, the Court would grant standing to the bank because the actions taken against it affected the psychotherapy market. Similarly here, the actions taken against Ostrofe affected the labels market.

As sales manager of one of the label manufacturers, Ostrofe was an essential

participant in the scheme to eliminate competition in the marketing of labels by fixing prices and allocating customers. It could not succeed without his active cooperation. When Ostrofe sold labels to customers not allocated to his employer and at prices below those agreed upon, his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme. Cf. Monsanto Co. v. Spray-Rite Service Corp., — U.S. —, —, 104 S.Ct. 1464, 1472, 79 L.Ed.2d 775 (1984) (distributors contemplating compliance with price fixing necessarily would know supplier would terminate those who did not participate).

Although Ostrofe was not a competitor or consumer in the labels market, the injury he sustained was such an integral part of the scheme to eliminate competition in that market as to constitute "antitrust injury" as that concept is developed in Blue Shield.

The fact that Ostrofe was a direct and necessary participant in the conspiracy by reason of his position as Crocker's sales manager is relevant not only because it establishes the direct relationship between his injury and the antitrust violation, but also because there is no one else with as strong an incentive "to vindicate the public interest in antitrust enforcement." Associated General Contractors, 103 S.Ct. at 911.[1] Continued participation in the price fixing conspiracy would have exposed Ostrofe to criminal liability under the Sherman Act. United States v. Wise, 370 U.S. 405, 407, 82 S.Ct. 1354, 1356, 8 L.Ed.2d 590 (1962). Refusal to cooperate made his discharge inevitable.

Accordingly, we conclude that Ostrofe satisfied the "antitrust injury" requirement for standing under Associated General Contractors read in light of Blue Shield.

### B.

We turn to the question whether Ostrofe had standing to challenge the label market conspiracy if we have read Blue Shield's exposition of "antitrust injury" too broadly and Ostrofe's injury cannot be properly placed in that category.

Associated General Contractors expressly reserved this precise question, namely, "whether the direct victim of a boycott, who suffers a type of injury unrelated to antitrust policy, may recover damages when the ultimate purpose of the boycott is to restrain competition in the relevant economic market." 103 S.Ct. at 910 n. 44 (emphasis added).

■ Assuming, therefore, that Ostrofe's injury did not result directly from the elimination of competition in the labels market that was the primary purpose of the price fixing conspiracy, we believe nonetheless that allowing Ostrofe standing would be a sound interpretation of section 4. Our reasons for this conclusion are stated in our original opinion in the discussion of Ostrofe's standing under his proposed amendment alleging that Crocker had discharged Ostrofe unilaterally to effectuate the conspiracy. Ostrofe's standing under the boycott charge seemed clear from Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). See Ostrofe I, 670 F.2d at 1382–86.

A wooden application of a technical requirement of "antitrust injury" narrowly defined would have little to recommend it. As the Court said in Associated General Contractors, it is "virtually impossible to announce a black-letter rule that will dictate the result in every case." 103 S.Ct. at 908. As we pointed out in our earlier opinion, allowing standing to Ostrofe would serve the public interest in effective antitrust enforcement and present none of the concerns counseling limitations on the right to sue under section 4. Ostrofe I, 670 F.2d at 1383–86. Assuming Ostrofe himself is held not to have sustained antitrust injury in the strictest sense from the conspiracy

---

**1.** Ostrofe's complaint triggered the investigation that led to the filing of civil and criminal antitrust actions against paper label companies by the Department of Justice in March 1974. Note, Employee Standing to Sue under Section 4 of the Clayton Act, 81 Mich.L.Rev. 1846, 1865–66 n. 97.

to fix prices in the label market, his refusal to cooperate with the conspiracy nonetheless helped vindicate the rights of customers and competitors in that market. Affording standing to sue to such an employee discharged because he refused to cooperate in an antitrust violation by his employer encourages exposure of such schemes by persons best situated to know of their existence. Presumably others were also victimized by the price fixing conspiracy, but it is unlikely that any other victim with knowledge of the conspiracy sustained a kind of injury that would give him equal incentive to bring the antitrust violators to account. Denying standing to one in the position of Ostrofe and others similarly situated is "likely to leave a significant antitrust violation undetected or unremedied." *Id.* at 911. *See Crimpers Productions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 296–97 (2d Cir.1983). The injury to such an employee is intentional and is caused in fact by the employer's conspiracy to restrain competitors. The injury is neither remote nor derivative from injury to others but is immediate and direct. Ostrofe's damages were incurred by him alone; there is no problem of apportionment or duplicative recovery. We conclude that in these circumstances antitrust standing is appropriate and consistent with the purposes of the Act.

## V.

Crocker argues that the Supreme Court's disposition of petition for certiorari in *Bichan v. Chemetron Corp.,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), sends a signal that we should hold on remand that Ostrofe did not have standing to sue.

*Ostrofe* was decided in May 1982. In June of that year, the Seventh Circuit held in *Bichan (In re Industrial Gas Antitrust Litigation),* 681 F.2d 514, that the president of a company, fired because he refused to adhere to a conspiracy to fix prices and allocate customers, lacked standing to sue under Section 4. *Associated General Contractors* was decided February 22, 1983. On March 1, the Supreme Court granted certiorari in *Ostrofe* and vacated and remanded to this court "for further consideration in light of" that case. On the same day, the Court denied certiorari in *Bichan.* The order denying certiorari in *Bichan* contained the statement that Justice Blackmun would have granted certiorari and remanded to the Seventh Circuit for reconsideration in light of *Associated General Contractors*—the action taken in *Ostrofe.* The appellee's argument is that by remanding *Ostrofe,* in which standing was sustained, and at the same time failing to remand *Bichan,* in which standing was rejected, the Supreme Court indicated that *Associated General Contractors* supported the result in *Bichan* and not the result in *Ostrofe.*

This is clearly not true as to Ostrofe's standing to sue for damages resulting from the boycott directed against him in the employment market for managerial personnel. As we have seen, *Associated General Contractors* expressly excluded such a case, 103 S.Ct. at 903, n. 14. Moreover, this issue was not decided in *Bichan, see* 681 F.2d at 517. ("Bichan's injury did not result from a lack of competition in the labor market. The conspiracy Bichan charges was aimed at restraining competition in the industrial gas market....") Accordingly, at least as to this issue, failure to remand *Bichan* for reconsideration in light of *Associated General Contractors* suggests nothing with respect to *Ostrofe.*

There are also substantial reasons for concluding that the Supreme Court's differing treatment of *Bichan* and *Ostrofe* was not intended to suggest we reverse our holding with respect to standing to challenge the conspiracy to restrain the product market.

A remand of *Bichan* for reconsideration in light of *Associated General Contractors* would have been puzzling, for both cases declined to find standing. Reconsideration of *Ostrofe,* was appropriate, however, because it reached a different result than *Associated General Contractors,* thus presenting at least a superficial conflict counseling reexamination. Had the

result of that reexamination been clear, the Court would have simply reversed.[2]

As we have said, the issue involving standing of a plaintiff lacking antitrust injury to challenge a product market conspiracy is expressly reserved in footnote 44 of *Associated General Contractors*. It is unlikely that the Court intended by its treatment of *Ostrofe* and *Bichan* to decide by implication the question it had contemporaneously reserved. The more plausible explanation is the Court intended to leave unresolved for a time both the conflict over standing for direct victims not sustaining antitrust injury and the conflict as to whether such employees did suffer antitrust injury.

The brief in opposition to the petition for certiorari in *Bichan* provides a basis for this assumption. Chemetron Corporation's lawyers pointed out that the Court had previously declined to grant certiorari in the face of circuit conflicts over antitrust standing, citing *Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073 (9th Cir.1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971). They suggested that the conflict between *Bichan* and *Ostrofe* involved the standing "of a very narrow class of antitrust plaintiffs," and was one that "may well be resolved by future litigation" in the different circuits or within the Ninth Circuit. They argued:

> [T]he battle lines over the issue of antitrust standing for the terminated employee are not sharply drawn except as between two of twelve circuits. Any decision by this Court concerning the propriety of review should properly await further litigation that, even if not leading to total harmony, might produce a satisfactory majority view among the lower courts.

Brief in Opposition at 5. It is not unreasonable to assume that the Court found this argument persuasive.

We conclude that the Supreme Court meant us to reconsider our decision in light of *Associated General Contractors* and nothing more.

On the basis of that reconsideration, we adhere to our original decision.

KENNEDY, Circuit Judge, dissenting:

Although the majority has labored to give its opinion a new cast, the briefest glance reveals that its logic and its reasoning are unchanged. The essence of it is a restatement of *Ostrofe I*, 670 F.2d 1378 (9th Cir.1982), vacated for reconsideration in light of *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). *See* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983). *Cf. Sumner v. Mata*, 611 F.2d 754 (9th Cir.1979), *vacated*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), *on remand*, 649 F.2d 713 (9th Cir.1981), *vacated*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982), *on remand*, 696 F.2d 1244 (9th Cir. 1983), *vacated as moot*, —— U.S. ——, 104 S.Ct. 386, 78 L.Ed.2d 332 (1983). For the second time, I dissent. I incorporate my previous remarks here and add the following.

We agree that Ostrofe has standing to challenge a conspiracy among label manufacturers to boycott his services. *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Anderson v. Shipowners Association of the Pacific Coast*, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926); *Quinonez v. National Association of Securities Dealers, Inc.*, 540 F.2d 824 (5th Cir.1976); *Nichols v.*

---

**2.** *See* R. Stern & E. Gressman, Supreme Court Practice, 362–63 (5th Ed. 1978) and cases collected at 363 nn. 30–32. One commentator has suggested that the Court has abandoned the practice of issuing summary reversals in light of intervening precedent. *See* Hellman, *"Granted, vacated, and remanded,"* 67 Jud. 389, 392 (1984). The Court itself, however, has announced no such change of policy. Even if

cases that previously would have been summarily reversed now are remanded, we could not conclude that this is such a case. It would be all but impossible to distinguish between cases in which only reconsideration was intended and those in which reversal was thought proper. Consequently, our duty is to read the intervening Supreme Court decision fairly and determine whether it requires a different result.

*Spencer International Press, Inc.,* 371 F.2d 332 (7th Cir.1967). For the reasons stated in my first dissent, I think summary judgment was properly entered against Ostrofe on this claim. *See Ostrofe I,* 670 F.2d at 1391. Those reasons need not be restated or expanded since, as the majority correctly notes, this aspect of *Ostrofe I* was not called into question by *Associated General.*

The issue I should have thought we were to reconsider is whether Ostrofe may seek treble damages based on his yearly salary as compensation for injuries resulting from Crocker's participation in a price-fixing conspiracy in the labels market. *Associated General* requires a holding that Ostrofe's injury does not give rise to the treble-damage remedy.

In *Associated General,* the Supreme Court agreed the complaint stated a claim as to an injured firm, but denied the unions had standing for redress under the antitrust laws. The Court characterized the facts as follows: (1) the complaint alleged a causal connection between the antitrust violation and the injury; (2) the defendants intended to injure the plaintiffs; (3) since the unions were neither consumers nor competitors in the construction market, their injury was not of the type that the antitrust laws were intended to forestall; (4) the injury was indirect; (5) damages were speculative; and (6) there was a risk of duplicative recoveries or complex damage apportionment. *Associated General,* 459 U.S. at 537–46, 103 S.Ct. at 908–13; *Chelson v. Oregonian Publishing Co.,* 715 F.2d 1368, 1370–71 (9th Cir.1983).

*Associated General* settled the law of antitrust standing in several respects. The Court made it explicit that *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), did not establish a new dimension of liability, but was simply a traditional recognition that one who is the direct object of a conspiracy may recover for it. *Associated General,* 459 U.S. at 529 n. 19, 103 S.Ct. at 904 n. 19. *See also Blue Shield,* 457 U.S. at 484 n. 21, 102 S.Ct. at 2551 n. 21. The Court further

affirmed that *Blue Shield* did not alter the concept of antitrust injury. *Associated General,* 459 U.S. at 538–40, 103 S.Ct. at 909–10; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In the case before us, the majority's reliance on the broad language of *Blue Shield* to extend liability to Crocker is thus misplaced. *See* Majority Opinion at 745–746. By raising *Blue Shield* to support standing, without recognition of the necessary limitations of *Associated General* and *Brunswick,* the majority violates the terms of the Supreme Court's remand and contravenes the elemental rule that cases not be read in isolation. Indeed, by stating that Ostrofe has "standing under *Associated General Contractors* read in light of *Blue Shield,*" Majority Opinion at 746, the majority has it altogether backwards. We should instead read *Blue Shield* in light of the limitations placed on it by *Associated General,* the case we were instructed to consult.

The plaintiff in *Blue Shield* was a participant in the market for psychotherapeutic services. Blue Shield, by refusing to reimburse McCready, was attempting to coerce her into consulting a psychiatrist rather than a psychologist. As a participant in the market for subsidized psychotherapy services who suffered direct injury in that market, McCready was allowed standing to sue for the refusal to reimburse her. *See Associated General,* 459 U.S. at 538, 540 nn. 39, 44, 103 S.Ct. at 909, 910 nn. 39, 44. In essence, McCready alleged that the price to her for services in the subsidized psychotherapy market had been fixed artificially high as a result of the concerted refusal to reimburse her. *See Blue Shield,* 457 U.S. at 484 n. 21, 102 S.Ct. at 2551 n. 21. In terms of standing to bring suit, McCready was thus like an ordinary consumer who complains about price-fixing in a particular market.

Ostrofe's position is not comparable to McCready's since, as the majority notes, Majority Opinion at 746, Ostrofe was not a competitor or consumer in the market affected by the price-fixing conspiracy, and in

relation to that price-fixing, Ostrofe's injury was therefore indirect. The predictable holding in *Blue Shield* does not support the holding here except in the meaningless, *post hoc* sense that the majority confers standing on the plaintiff.

The majority acknowledges its reading of *Blue Shield* may be too broad and so retreats to a second position, but one likewise indefensible. It constructs an alternative holding, said to be supported by footnote 44 of *Associated General*. It argues the footnote raises the issue whether antitrust injury is a necessary element in every antitrust suit. Majority Opinion at 746. Remarkably, the majority announces this issue was resolved in *Ostrofe I*. Majority Opinion at 746–747. But if the question was resolved in our earlier opinion by this theory, the Supreme Court would not have vacated for reconsideration.

The majority's confusion comes from its misapplication of footnote 44. The footnote reserves the question "whether the direct victim of a boycott, who suffers a type of injury unrelated to antitrust policy, may recover damages when the ultimate purpose of the boycott is to restrain competition in the relevant economic market." *Associated General*, 459 U.S. at 540 n. 44, 103 S.Ct. at 910 n. 44. In applying this language, the first question is whether Ostrofe was a direct victim of a boycott. The majority assumes the answer to this question and, in so doing, misconceives the issue before us. Majority Opinion at 746–747.

We all agree that Ostrofe has standing to assert his direct boycott claim under the *Radovich* line of cases. That claim was, in my opinion, properly dismissed on a motion for summary judgment. The only issue we are reconsidering is whether Ostrofe has standing to challenge the price-fixing conspiracy as the proximate cause of his discharge injury, an injury the majority recognizes is not dependent on the existence of a direct boycott. Majority Opinion at 744. Without a direct boycott, however, footnote 44 of *Associated General* is, by its terms, inapplicable.

The precise meaning of footnote 44 is unclear, and the footnote contains no examples of a case that might raise the issue reserved. It is difficult to imagine an anticompetitive group boycott of a plaintiff that does not cause antitrust injury. Whatever its meaning, the footnote by its terms does not apply to Ostrofe's claim, which is premised on injury flowing from a price-fixing conspiracy, not injury resulting from a group boycott.

The majority in effect rewrites the complaint by a merger of the boycott theory of recovery with recovery for damages from the price-fixing conspiracy. This new creation, not found even in *Ostrofe I*, blurs analysis and seems invented only to justify the result. The two theories of recovery are quite distinct, however, and recovery on the boycott theory does not necessarily lead to a valid claim for recovery for price-fixing. The confusion in analysis is seen especially in the discussion of footnote 21 of *McCready, see* Majority Opinion at 745, and in the discussion of footnote 44 of *Associated General. See* Majority Opinion at 746–747. In both discussions, the premise that supports standing is that Ostrofe was the victim of a group boycott. That premise is at odds with the issue presented for reconsideration.

The difficulty with Ostrofe's remaining claim for treble damages is that it does not allege an injury related to an antitrust violation; the measure of damages does not reflect or respond to the breakdown in competition caused by the antitrust violation. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See generally* Page, *Antitrust Damages and Economic Efficiency: An Approach to Antitrust Injury,* 47 Univ.Chi.L.Rev. 467 (1980). A treble damage measure "unrelated to the size of the injury increases the total social cost of antitrust enforcement." Page, *supra,* at 497 (footnote omitted). Ostrofe's damages, by their nature, will be the same regardless of the success of the price-fixing conspiracy. By contrast, the damages sought in a price-fixing suit are proportional to the de-

gree to which the conspiracy is successful in destroying competition and raising prices, and damages in a suit challenging a monopoly are measured by lost profits proportional to the size and power of the monopoly. We have on occasion included consequential damages in an antitrust award, but only when the plaintiff also has other damages that are related to the decrease in competition. *See Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282 at 1296–97 (9th Cir.1984) (awarding costs of defending sham patent infringement suit in addition to lost profits).

Antitrust enforcement becomes divorced from antitrust policy when treble damages bear no relation to the anticompetitive effects of the illegal conduct. Such awards threaten to make every business tort convertible into a treble-damage bonanza. The antitrust laws were not intended as a balm for all wrongdoing in the business community. They were designed to promote free competition. That clear focus is lost when courts allow treble damages to plaintiffs who show no injury related to the breakdown of competitive conditions in the marketplace.

The Supreme Court reaffirmed this principle of limitation in *Associated General.* The Court held that "allegations of consequential harm resulting from a violation of the antitrust laws, although buttressed by an allegation of intent to harm [the plaintiff], are insufficient as a matter of law." *Associated General,* 459 U.S. at 545, 103 S.Ct. at 913. Ostrofe's claim is within the square of this language and should be dismissed.

In its zeal to compensate Ostrofe for his injury, the majority has given Ostrofe the wrong cause of action. He should be seeking remedies for wrongful discharge, not treble damages for a violation of the antitrust laws. *See, e.g., Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (wrongful discharge action by employee who was fired after refusing to participate in price-fixing scheme). *See generally* Note, *Standing of the Terminated Employee Under Section 4 of the Clayton Act,* 25 William & Mary L.Rev. 341, 369–71 (1983).

The majority seeks solace in its prediction that this case raises issues peculiar to its facts and that our result involves only a small number of potential antitrust plaintiffs. Majority Opinion at 748. If this is intended to justify an otherwise unwarranted extension of antitrust standing, then I disagree with the implication we are free to ignore prior law when it suits our purposes. In any event, whether or not the opinion can be limited to its facts is a question we are not capable of answering; that determination will be made in subsequent cases. For my part, I believe that the majority enunciates unsound principles of antitrust liability, and that the case will have implications far beyond the employment context.

Finally, by reaffirming *Ostrofe I,* the majority creates a conflict with the Seventh Circuit in *Bichan v. Chemetron Corp.,* 681 F.2d 514 (7th Cir.1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). To say, as the majority does, that the Supreme Court does not worry about circuit conflict when it comes to antitrust standing, *see* Majority Opinion at 747–748, is a strange way to interpret the Supreme Court's order vacating the majority's first opinion.

*Bichan* was an explicit consideration and rejection of the majority's opinion in *Ostrofe I,* and the Supreme Court chose to deny certiorari in *Bichan* on the same day *Ostrofe I* was vacated. It is inappropriate for us to speculate on the reasons for declining the issuance of certiorari. But in answer to the majority, I think it appropriate to say that I doubt the Supreme Court values our reconsideration more than that of the Seventh Circuit, and it is patronizing for the majority to imply otherwise.

The majority has reconsidered this case only by rephrasing the same arguments that were made in *Ostrofe I,* giving heed neither to the opinion in *Associated General* nor to the Seventh Circuit. In consequence, a necessary analytic structure is

absent from the majority opinion, and its holding, I respectfully suggest, is incorrect.