**METRO–GOLDWYN–MAYER STUDIOS INC., et al., Plaintiffs,**

**v.**

**GROKSTER, LTD., et al., Defendants.**

**Jerry Leiber, et al., Plaintiffs,**

**v.**

**Consumer Empowerment BV a/k/a Fasttrack, et al., Defendants.**

**Nos. CV 01–08541–SVW(PJWx), CV 01–09923–SVW (PJWx).**

United States District Court, C.D. California.

July 2, 2003.

Richard H. Cooper, Thomas G. Hentoff, Beth A. Levene, David E. Kendall, Robert J. Shaughnessy, Nicholas J. Boyle, Ana C. Reyes, Kevin Hardy, Joseph Marshall Terry, Williams & Connolly, Washington, DC, Matthew J. Oppenheim, Dean Garfield, Recording Industry Ass'n of America, Washington, DC, Gregory Paul Goeckner, Motion Picture Ass'n American, Encino, CA, Jan B. Norman, Mark D. Litvack, Jan B. Norman Law Offices, Encino, CA, for plaintiffs.

Michael H. Page, Mark A. Lemley, Stacey L. Wexler, Keker & Van Nest, San Francisco, CA, Jennifer Stisa Granick, Stanford Law School, Stanford, CA, for defendant.

## ORDER GRANTING IN PART PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS

WILSON, District Judge.

### I. INTRODUCTION

On January 9, 2003, this Court denied a motion by Defendant Sharman Networks, Ltd. ("Sharman") to dismiss for, among other reasons, lack of personal jurisdiction. On February 18, 2003, Sharman filed a First Amended Answer and Counterclaims ("FAAC"). Sharman brings three federal counterclaims against Plaintiffs[1]: (1) "re-

---

**1.** This litigation involves two consolidated cases: *Metro–Goldwyn–Mayer Studios, Inc.* ("MGM") v. Grokster, Ltd., CV 01–8541–SVW, and *Lieber v. Consumer Empowerment BV,* CV 01–9923–SVW. Sharman's counterclaims are directed only against the plaintiffs in the *MGM v. Grokster* case ("Plaintiffs" for purposes of this Motion), consisting of many of the world's largest motion picture studios and music recording companies.

fusal to deal" in violation of Section 1 of the Sherman Act; (2) "conspiracy to monopolize" in violation of Section 2 of the Sherman Act; and (3) declaratory relief as to copyright misuse. Sharman also counterclaims under two provisions of California law, for trust against public policy and unfair business practices.

Now before the Court is Plaintiffs' Motion to Dismiss the Counterclaims. For the reasons set forth herein, the Motion is GRANTED IN PART. Further briefing is ordered as provided below.

## II. FACTUAL BACKGROUND

### A. *Sharman's Business Plan: DRM Management*

Sharman distributes Kazaa Media Desktop (the "Kazaa software"), one of the world's most widely-downloaded peer-to-peer filesharing clients, and operates the Kazaa.com website. Sharman claims that, when it was formed, its founders intended to create a platform for distributing *licensed* copyrighted works, which end-users would pay to receive. (In other words, a user could "buy" a song online, instead of buying a CD at the mall.) These works would be protected by Digital Rights Management ("DRM") controls. A DRM control works like a lock, which only an authorized user can open. Thus, any person can download a DRM-protected file to their computer, but only those who have paid to access the file can actually open it (e.g., listen to it).

In the last year, Sharman has entered into a partnership with third-party "Altnet," which is not a party to this case. According to Sharman, Altnet licenses copyrighted works, and then encodes digital versions of those works with a DRM "lock." When a Kazaa user searches for content—say, music or video games—the Altnet files are displayed along with other content (some of which forms the basis of Plaintiffs' underlying lawsuit). An Altnet

song or video game is downloaded like any other file. Unlike illegally traded files, however, only those who pay a fee to Altnet can actually use the Altnet files. Sharman alleges that this solution works: after only seven months, Altnet is issuing nearly fifteen million licensed files per month, for things such as video games, independent music content, and other works not owned or distributed by Plaintiffs. Sharman is paid a "fee" for those Altnet files distributed across the Kazaa software and "network."

While users can still illegally exchange unlicensed copyrighted works, Sharman has altered the Kazaa software to highlight licensed content from Altnet. Thus, when a user searches for a file using Kazaa, the DRM-protected Altnet content appears at the top of the list. Sharman also alleges that it uses (or can use) other "incentives" designed to promote the downloading of licensed content.

### B. *Alleged Conduct by Industry Plaintiffs*

While there is considerable redundancy in the counterclaims, the essence of Sharman's grievance appears to be thus: Sharman alleges that Plaintiffs control as much as eighty-five percent of the market for manufacturing, labeling and distributing copyrighted music and films. Sharman further alleges that Plaintiffs together have acted monopolistically and in restraint of trade by refusing to license any copyrighted works to Altnet. This conduct, the FAAC claims, unlawfully precludes Sharman and Altnet from competing effectively in the market for distribution of *licensed* copyrighted works.

Sharman includes a number of other allegations, though it is not clear to which specific claim(s) they relate. Sharman alleges, for instance, that there are compa-

nies affiliated with Plaintiffs that themselves distribute filesharing software, and that Plaintiffs have not insisted that these companies police their systems in the same manner Plaintiffs demand of Sharman. Sharman also asserts that Plaintiffs distribute "fake" songs to harm Sharman's business.

Sharman counterclaims under Section 1 of the Sherman Act, which prohibits conspiracies or combinations in restraint of interstate commerce, and under Section 2, which bars monopolization of trade. *See* 15 U.S.C. §§ 1, 2.

Sharman also brings analogous state antitrust claims under California's Cartwright Act, *see* Cal. Bus. & Prof.Code §§ 16700, 16726, and separately claims that Plaintiffs' conduct violates the state's unfair competition law. *See* Cal Bus & Prof Code §§ 17200 et seq.

Finally, Sharman seeks a judicial declaration that Plaintiffs have misused their copyrights, and thus that those copyrights are unenforceable.

## II. LEGAL STANDARD

Dismissal pursuant to Rule 12(b)(6) is appropriate where the plaintiff fails to state a claim upon which relief may be granted. Fed. Rules Civ. P. 12(b)(6). For purposes of this Motion, the Court accepts as true all non-conclusory, material allegations of the FAAC and construes them in the light most favorable to Sharman. *See Newman v. Sathyavaglswaran*, 287 F.3d 786, 788 (9th Cir.2002) (citing *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1196 (9th Cir.1998)). The Court also draws all reasonable inferences from these allegations in Sharman's favor. *See Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

## III. DISCUSSION

### A. *Section 1 of the Sherman Act*

■ "To establish a section 1 violation under the Sherman Act, a plaintiff must demonstrate three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition, beyond the impact on the claimant, within a field of commerce in which the claimant is engaged (i.e., 'antitrust injury')." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir.1988).

While Plaintiffs effectively concede that the FAAC properly alleges the second element, they contest its sufficiency with respect to the other two. The Court begins with the third element, as Sharman's standing to bring both Sherman Act counterclaims depends upon whether it has properly alleged an antitrust injury.

### 1) *Antitrust Standing*

■ Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Despite the apparent expansiveness of this provision, and though the Supreme Court has intoned against engrafting artificial limitations on the private right of action, *see, e.g., Pfizer, Inc. v. Government of India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961), standing under the Clayton Act is more limited than that required for Article III justiciability. *See Associated General Contractors of California, Inc. v. Califor-*

*nia State Council of Carpenters,* 459 U.S. 519, 529–35, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

■ "Therefore, courts have constructed the concept of antitrust standing, under which they 'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them,' to determine whether a plaintiff is a proper party to bring an antitrust claim." *American Ad Mgmt., Inc. v. General Tel. Co.,* 190 F.3d 1051, 1054 (9th Cir.1999) (internal citation omitted). Although the standing inquiry is an elusive and highly contextual one, the Supreme Court has identified certain factors that inform the analysis, including:

1) the nature of the plaintiff's alleged injury (whether it is the type the antitrust laws were intended to forestall);
2) the risk of duplicative recovery;
3) the directness of the injury;
4) the speculative measure of damages; and,
5) whether damages would be complex to apportion.

*American Ad Mgmt.,* 190 F.3d at 1055 (citing *Associated General,* 459 U.S. at 538–45, 103 S.Ct. 897; *Bubar v. Ampco Foods, Inc.,* 752 F.2d 445, 449 (9th Cir. 1985)).

### a. *Nature of the Alleged Injury*

■ The most important factor relates to the nature of the alleged injury, i.e., whether it is an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). This reflects "the central interest [of the Sherman Act] in protecting the economic freedom of participants in the relevant

market." *American Ad Mgmt.,* 190 F.3d at 1057 (quoting *Associated General,* 459 U.S. at 538, 103 S.Ct. 897).

■ The Ninth Circuit has derived from this principle the correlative standing requirement that the "injured party be a participant in the same market as the alleged malefactors." *Bhan v. NME Hosp., Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985), *quoted in American Ad Mgmt.,* 190 F.3d at 1057. "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *American Ad Mgmt.,* 190 F.3d at 1057; *see also R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 890 F.2d 139, 148 (9th Cir.1989).

■ Although the FAAC is somewhat opaque in terms of identifying the relevant market(s), Plaintiffs appear to accept Sharman's position in its Opposition that the relevant markets are those for digital distribution over the Internet of copyrighted sound recordings and of major motion pictures. (*See* Sharman's Opp. to Mot. to Dismiss Counterclaims ("Opp.") at 1, 7; Pls.' Reply in Supp. of Mot. to Dismiss ("Reply") at 1–5.)

At first blush, it seems apparent that Altnet, and not Sharman, participates in this market. Plaintiffs note Sharman's repeated assertion that it is a distributor of "contentless" or "content neutral" peer-to-peer filesharing software. (*See* Sharman's Sept. 30, 2002 Memo. in Supp. of Mot. to Dismiss First Amend. Compl. at 1, 25; Sharman's Nov. 18, 2002 Reply Memo. in Supp. of Mot. to Dismiss at 1, 10.) Plaintiffs argue that Sharman does not itself distribute content (copyrighted or otherwise), and has never sought a license to distribute copyrighted works (from Plaintiffs or anyone else). Thus, Sharman is neither a competitor nor customer in the relevant market. Rather, Sharman's sole

stake in that market arises derivatively from its contractual relationship with Altnet: the more works Altnet licenses and distributes, the more fees are paid to Sharman for facilitating that distribution.

Despite some seemingly contrary precedent, however, the Ninth Circuit in *American Ad Mgmt.* made clear that the "market participant" requirement does not limit standing to customers and competitors in the relevant market. *See* 190 F.3d at 1057–58. The Ninth Circuit's pronouncement in this respect was informed by the Supreme Court decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

In that case, plaintiff Carol McCready was a member of an employer-purchased Blue Shield group health insurance plan, which provided partial reimbursement for certain mental health treatment, including psychotherapy. *McCready*, 457 U.S. at 468, 102 S.Ct. 2540. McCready alleged that Blue Shield would only reimburse for psychotherapy rendered by a psychiatrist, and would not do so for treatment by a psychologist who is not under the supervision of a physician. *Id.* McCready contended that the policy reflected an unlawful conspiracy to exclude psychologists from coverage under the plans. *Id.* at 469–70, 102 S.Ct. 2540. As a result, McCready claimed she was injured when Blue Shield refused to reimburse her for treatment by a psychologist. *Id.* at 470, 102 S.Ct. 2540.

Because the anticompetitive conduct alleged in *McCready* targeted psychologists and attempted to exclude them from the health insurance market, petitioners in the case argued that McCready's injury did not flow from the allegedly unlawful conduct. *Id.* at 478, 102 S.Ct. 2540. Indeed, the district court had concluded that the " 'sector of the economy competitively endangered' by the charged violation extended 'no further than the area occupied by

the psychologists.' " *Id.* at 470, 102 S.Ct. 2540 (quoting district court). The Supreme Court disagreed, observing that although McCready was not a competitor in the affected market, "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484, 102 S.Ct. 2540.

The Ninth Circuit echoed this language in *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir.1984), a case relied upon by Sharman. The plaintiff in *Ostrofe* was defendant Crocker's former marketing director. *Id.* at 741. Ostrofe allegedly refused to perform activities necessary to Crocker's purported conspiracy to restrain trade in the market for paper lithograph labels. *Id.* at 741–42. When he refused to go along with the conspiracy, Ostrofe alleged, Crocker terminated him, and he was boycotted from further employment in the industry. *Id.* at 742. Although the plaintiff in *Ostrofe* was not a participant in the relevant market, the Ninth Circuit concluded that "his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme." *Id.* at 746.

■ *Ostrofe* is somewhat unique—and is illustrative—because although the plaintiff was not a participant in the restrained market, his injury was necessary and integral to the alleged antitrust scheme. *Cf. Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir.), *cert. denied,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985) (loss of job does not typically give rise to antitrust standing). Likewise, the injury to the plaintiff in *McCready* "was a necessary step in effecting the ends of the alleged illegal conspiracy." 457 U.S. at 479, 102 S.Ct. 2540. Both cases stand for the proposition that, "[w]here the injury alleged is so integral an aspect of the conspiracy

alleged, there can be no question but that the loss was precisely the type of loss" that the antitrust laws were intended to forestall. *Id.* (quotation marks omitted).

◾ In contrast, a party does not have standing simply because it has a commercial relationship with a market participant, thereby giving it an economic interest in avoiding restraint of the relevant market by a third party. In *Eagle v. Star–Kist Foods, Inc.*, 812 F.2d 538, 539 (9th Cir. 1987), for instance, the Ninth Circuit considered claims brought by tuna fishermen and their union alleging that certain companies had conspired to set artificially low tuna prices. The fishermen were paid either a price per ton reflecting the ultimate retail price, or through a "share of the catch" arrangement. *Id.* Although the fishermen were indirectly injured as a result of the artificially low prices, they lacked standing because the anticompetitive conduct itself was directed to "the vessel owners, not the crewmembers or the union." *Id.* at 541; *see also Legal Economic Evaluations, Inc. v. Metropolitan Life Ins. Co.*, 39 F.3d 951, 954–56 (9th Cir.1994) (consulting firms that advised tort plaintiffs about structured settlement annuities are not participants in the market for annuities); *Exhibitors' Serv. v. American Multi–Cinema*, 788 F.2d 574, 577–81 (9th Cir.1986) (film exhibition licensing agent, which alleged injuries from anticompetitive conduct in market for first-run film exhibition, is not a participant in that market); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219–220 (4th Cir.1987) (no standing for company that stood to earn royalty payments from third party's coal mining contract, which contract was allegedly terminated as a result of antitrust violations, where principal injury would be to the third party).

Sharman's alleged injuries arise only because it stands to benefit from Altnet's potential success in the relevant market. As Sharman is neither a competitor nor customer in the restrained market, and because its injury is incidental, and not integral, to the alleged anticompetitive scheme, Sharman does not have standing.

This conclusion is confirmed by the other factors considered in the standing analysis.

b. *Directness of the Injury*

◾ Antitrust standing requires an inquiry into the "physical and economic nexus" between the alleged violation and the harm to the plaintiff. *McCready*, 457 U.S. at 477, 102 S.Ct. 2540; *see Associated General Contractors*, 459 U.S. at 540, 103 S.Ct. 897. Thus, this factor looks to whether the alleged injury was a proximate cause of the defendants' allegedly anticompetitive conduct. *American Ad Mgmt.*, 190 F.3d at 1058.

"A direct relationship between the injury and the alleged wrongdoing has been one of the 'central elements' of the proximate causation determination, and 'a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendants' acts [ ] generally [has been] said to stand too remote a distance to recover." *Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*, 241 F.3d 696, 701 (9th Cir.2001) (no standing for public hospitals and their associations in case brought against tobacco companies for costs incurred in treating patients' smoking-related illnesses) (quoting *Oregon Laborers Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963 (9th Cir.1999)) (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268–69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)); *Eagle*, 812 F.2d at 541 ("The chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims' of any alleged antitrust viola-

tion."); *Toscano v. PGA Tour, Inc.,* 201 F.Supp.2d 1106 (E.D.Cal.2002) (no standing for golfer who claimed PGA excluded rival senior golf tours, thereby depriving plaintiff the opportunity to play on such alternative tours, as his injury would be wholly derivative of the injuries to such tours).

*Eagle v. Star–Kist Foods, supra,* is the Ninth Circuit case involving facts perhaps most analogous to the instant case. In *Eagle,* the "immediate victim[s]" of artificially low tuna prices were the owners of the tuna fishing vessels. 812 F.2d at 541. The vessel owners had complete control over the negotiations and sales in the affected market. *Id.* Crewmember compensation was only later calculated as a proportion of the sale price. *Id.* Thus, the injuries to crewmember employees were strictly derivative of those suffered by the vessel owners themselves. *Id.* at 542.

Such is precisely the case here. Altnet is the company that has allegedly been thwarted in its efforts to license copyrighted content for digital distribution. Although Sharman's contractual services to Altnet facilitate the latter's participation in the relevant market, Sharman is, like the crewmembers in *Eagle,* compensated for its services in a manner reflecting the principal's success in the market. Any injury suffered by Sharman is entirely derivative of Altnet's alleged injuries, even if harm to Sharman is a foreseeable consequence of the conduct alleged.

 Indeed, it is specifically not the design of the Clayton Act to provide recourse to *every* party arguably injured by antitrust violations. Rather, the primary legislative purpose of the Clayton Act's treble damage provision is enforcement of the antitrust laws—that is, to "make private attorneys general out of the private parties" injured by anticompetitive conduct. *Eagle,* 812 F.2d at 542. Therefore, "the existence of an identifiable class of

persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general." *Associated General Contractors,* 459 U.S. at 542, 103 S.Ct. 897, *quoted in Eagle,* 812 F.2d at 542. *Compare Eagle,* 812 F.2d at 542 (denying standing to fishermen and noting that direct victims—the vessel owners—are sufficiently motivated to vindicate the statute), *with Ostrofe,* 740 F.2d at 747 (upholding standing for terminated marketing director and observing that it is unlikely any other victim had the same incentive to "bring the antitrust violators to account").

Here, Altnet, not Sharman, is the primary target of the conduct alleged and would suffer the principal injury. Accordingly, Altnet has the greatest motivation to enforce the antitrust laws in the form of a private claim, thereby further diminishing any justification for allowing Sharman to do so.

### c. *Duplicative Recovery*

The Supreme Court has repeatedly rejected antitrust claims by certain classes of persons where there is a "risk of duplicative recovery engendered by allowing every person along a chain of distribution to claim damages arising from a single transaction that violated the antitrust laws." *McCready,* 457 U.S. at 474–75, 102 S.Ct. 2540 (citing two price-fixing cases: *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (state cannot sue for damages to its "general economy"), *and Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (indirect purchaser cannot bring antitrust claim for portion of overcharge passed on to it)). Because a contrary rule could yield complex and splintered recoveries, the Supreme Court has limited standing to the

first link in the chain of commerce. *Illinois Brick*, 431 U.S. at 746–47, 97 S.Ct. 2061; *see McCready*, 457 U.S. at 474, 102 S.Ct. 2540 (no risk of duplicative recovery because, although psychologists were primary target of alleged anticompetitive scheme, plaintiff's psychologist had already been paid for treatment and thus plaintiff had suffered the only compensable injury).

■■■ In the instant case, there is clearly a risk of duplicative recovery if Sharman is afforded standing. Altnet is the company that licenses and packages copyrighted content for distribution. It is Altnet that has allegedly been rebuffed by Plaintiffs in its attempt to license copyrighted works, and it is Altnet that charges and collects payment for access to such works. Sharman's sole stake in this market consists of contractual "fee[s]" paid by Altnet to Sharman for distribution and promotion of Altnet-licensed works via the Kazaa software. (FAAC ¶ 61.) According to Sharman, it is the deprivation of such fees—which are themselves contingent on Altnet's growth and successful distribution of copyrighted works—that constitutes the actionable injury. (*Id.*) Although some of the alleged antitrust injury flows to Sharman in the form of lost fees, the whole of the injury is borne initially by Altnet. In these circumstances, precedent countenances against affording standing to Sharman.

### d. *Speculative Measure of Harm*

■■■ The Supreme Court in *Associated General* identified two factors that bear upon the speculative nature of a damage claim: (1) whether the injury alleged is indirect; and (2) whether the alleged effects may have been produced by independent factors. 459 U.S. at 542, 103 S.Ct. 897, *cited by American Ad Mgmt.*, 190 F.3d at 1059. As elucidated above, the injury alleged here is indirect. Moreover, Sharman's claim for lost fees under its contract with Altnet depends upon numerous independent factors relating to Altnet (e.g., whether Altnet would actually prevail in securing any of the licenses it seeks, how many such licenses would be secured, and the degree of success Altnet would then have in distributing licensed content).

### e. *Complexity in Apportioning Damages*

It is not clear from the FAAC whether Sharman's compensation under the contract with Altnet consists of a simple percentage of the revenue received, or something more complex.

Even assuming any damages could easily be apportioned, however, this factor would alone favor standing, while the balance of the *Associated General* factors militate strongly against it. The Court concludes, therefore, that Sharman lacks standing and is not a proper plaintiff to bring these Sherman Act claims.

### B. *Section 2 of the Sherman Act*

Because Sharman has not properly alleged antitrust standing, its Section 2 claim fails and is also dismissed.

### C. *Cartwright Act*

Sharman also alleges violations of California's Cartwright Act, which contains antitrust prohibitions similar to those provided by the Sherman Act. *See* Cal. Bus. & Prof.Code §§ 16700 et seq. The standing provision is slightly different than that of the Clayton Act, however, authorizing suit by "any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, *regardless whether such injured person dealt directly or indirectly with the defendant.*" Cal. Bus. & Prof.Code § 16750(a) (emphasis added).

■■■ Because this provision is broader than its Clayton Act analog, "the

more restrictive definition of 'antitrust injury' under federal law does not apply to section 16750." *Cellular Plus, Inc. v. Superior Court*, 14 Cal.App.4th 1224, 1234, 18 Cal.Rptr.2d 308 (1993); *see Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir.2000) (Cartwright Act "affords standing more liberally than does federal law."). While the standing provisions are broader, "[t]he exact parameters of 'antitrust injury' under section 16750 have not yet been established through either court decisions or legislation." *Cellular Plus*, 14 Cal.App.4th at 1234, 18 Cal.Rptr.2d 308. "Because the Cartwright Act has objectives identical to the federal antitrust acts," however, California courts do "look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act." *Vinci v. Waste Management, Inc.*, 36 Cal.App.4th 1811, 1814 n. 1, 43 Cal.Rptr.2d 337 (1995) (collecting cases).

█ It is clear, for instance, that the Cartwright Act's more expansive standing provision does not dispense with the requirement that an antitrust plaintiff allege an " 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Morrison v. Viacom, Inc.*, 66 Cal.App.4th 534, 548, 78 Cal.Rptr.2d 133 (1998) (quoting *Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 723, 187 Cal.Rptr. 797 (1982) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat., Inc.*, 429 U.S. 477, 487–89, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977))). Rather, the "broader California definition resulted from the United States Supreme Court's restrictive decision in *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, wherein the court precluded a lawsuit under federal antitrust law by indirect purchasers." *Cellular Plus, Inc.*, 14 Cal.App.4th at 1234, 18 Cal.Rptr.2d 308; *see also Knevelbaard*, 232 F.3d at 991 (same); *California v. ARC America Corp.*, 490 U.S. 93, 97–99, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (Cart-

wright Act's allowance of indirect purchaser standing not preempted by federal law). Thus, California law permits suit by an injured party who "dealt" with the alleged malefactor regardless whether the dealing was direct or indirect.

█ However, the party still must suffer an injury of the type the antitrust laws were meant to forestall, *see, e.g., Morrison*, 66 Cal.App.4th at 548, 78 Cal. Rptr.2d 133, which in turn requires that the party be a participant in the restrained market. *See Knevelbaard Dairies*, 232 F.3d at 987–89. Under California law, an indirect purchaser participates (indirectly) as a customer in the relevant market, and thus may suffer a cognizable antitrust injury.

█ For the reasons illustrated above, however, Sharman does not participate, directly or indirectly, in the relevant market. While Altnet may be an actor in the market for lawful digital distribution of copyrighted works, Sharman participates principally in the market for distribution of "contentless" peer-to-peer filesharing software (regardless whether its founders had other intentions at the company's inception). It has never sought to license and distribute copyrighted works, through Altnet or otherwise, and thus cannot have been directly affected by Plaintiffs' alleged refusal to license such works. While Sharman's contractual relationship with Altnet may mean that Sharman will benefit consequentially from Altnet's success in the relevant market, this no more converts Sharman into a participant in that market than it would Altnet's attorneys. Because Sharman does not "deal[ ]" with the purported antitrust violator in any respect, it is not afforded standing under the Cartwright Act.

Moreover, while the scope of actionable injury is slightly different under the Cartwright Act, the standing analysis is none-

theless informed by many of the same factors considered *supra.* *See Vinci,* 36 Cal.App.4th at 1814, 43 Cal.Rptr.2d 337.

Accordingly, Sharman's Cartwright Act is dismissed for lack of standing.

### D. *Copyright Misuse*

■■■■ Sharman alleges that if Altnet could license mainstream content and promote it on Kazaa, users would download the licensed content instead of the unlawful alternative. Sharman maintains that because Plaintiffs have refused to license any content to Altnet, Kazaa users by default see only unlicensed versions of Plaintiffs' works. Thus, Sharman concludes, Plaintiffs have unreasonably failed to cooperate with Sharman to combat unlawful filesharing and staunch the very infringement that forms the basis of Plaintiffs' underlying suit. Sharman believes that this conduct violates the "public policy embodied in the grant of a copyright," and should be sanctioned by holding Plaintiffs' copyrights unenforceable under the doctrine of copyright misuse. (FAAC, Counterclaims ¶¶ 70, 71, 74.)

Copyright misuse is a relatively recent addition to the corpus of judge-made copyright law. Historically, most courts to consider the question held that a copyright holder's violation of the antitrust laws did not give rise to a defense in a copyright infringement action. *See* 4–13 Nimmer on Copyright § 13.09 & n. 6 (collecting cases). This contrasts with the long-recognized defense of patent misuse. *See, e.g., Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942). Although one Supreme Court decision did seem to imply that the same principle applied in the copyright context, *see United States v. Loew's Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), the Fourth Circuit became the first appellate court to recognize explicitly a defense of copyright misuse. *See Lasercomb America, Inc. v.*

*Reynolds,* 911 F.2d 970, 973 (4th Cir.1990). The Ninth Circuit later joined with the Fourth Circuit and adopted this defense. *See Practice Mgmt. Info. Corp. v. AMA,* 121 F.3d 516, 521 (9th Cir.1997).

Indeed, Sharman asserts copyright misuse as an affirmative *defense* to Plaintiffs' claims for copyright infringement. (*See* FAAC at 10.) Because the Court can consider this defense in the context of Plaintiffs' suit against Sharman, and because, as Sharman concedes, copyright misuse cannot found a claim for damages (*see* Opp. at 17), the counterclaim appears redundant.

Sharman contends, however, that the declaratory relief it seeks is not duplicative of its affirmative defense, as a finding of misuse would "play[ ] an important notice function and public policy role in identifying for all the world the specific copyrighted works that will be unenforceable against *anyone* due to Plaintiffs' wrongful conduct." (*Id.* at 18 (emphasis added).) Without passing on Sharman's assumption that a finding of misuse would have such breadth of operation, the Court notes that this justification is somewhat specious. If the Court reaches the affirmative defense, any such notice would be equally effected by the Court's disposition of that defense. Rather, the separate declaratory claim presumably serves but one purpose: to ensure that the misuse issue will be decided, and any notice rendered, *even if* the affirmative defense is mooted by a finding that Sharman is not liable for infringement.

Sharman asserts jurisdiction for the sought-after relief under the copyright laws, and the Declaratory Judgments Act ("Act"), 28 U.S.C. §§ 2201, 2202. (*See* FAAC, Counterclaims ¶ 31.) The Act was intended to afford relief to those victimized by "scarecrow" litigation (i.e., circumstances in which a potential plaintiff im-

mobilizes others with the mere threat of litigation), by allowing district courts to declare the legal relations of affected parties. *Cardinal Chem. Co. v. Morton Int'l,* 508 U.S. 83, 96, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993) (quoting *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 734–35 (Fed.Cir.1988)). Because Plaintiffs' lawsuit against Sharman necessarily establishes the requisite controversy under the Act, the Court assumes that it has jurisdiction to hear a defense to infringement asserted as a declaratory counterclaim. *See Cardinal Chem. Co.,* 508 U.S. at 96, 113 S.Ct. 1967 (district court has jurisdiction to hear counterclaim for patent invalidity even where court has already found noninfringement[2]).

Sharman's reliance on *Cardinal Chem. Co., supra,* is inapt, however, inasmuch as Sharman suggests that it is dispositive as to whether the counterclaim must be entertained. That case was concerned primarily with issues of *appellate* jurisdiction. While the Supreme Court held that the Federal Circuit was not jurisdictionally obligated to vacate declaratory relief as to patent invalidity after affirming a district court's finding of noninfringement (i.e., the counterclaim for invalidity was not "moot" simply because noninfringement had been found and affirmed), the Court specifically noted that the Declaratory Judgments Act affords "the district court some discretion in determining whether or not to exercise [ ] jurisdiction [under the Act], even when it has been established." *Cardinal Chem. Co.,* 508 U.S. at 95 n. 17, 113 S.Ct. 1967 (citing *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 494–96, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942)); *accord Wilton*

*v. Seven Falls Co.,* 515 U.S. 277, 286–88, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (noting district court's "unique and substantial discretion" under the Act to declare rights of litigants). In other words, even where jurisdiction exists, the exercise of that jurisdiction "is committed to the sound discretion of the federal district courts." *Huth v. Hartford Ins. Co.,* 298 F.3d 800, 802 (9th Cir.2002).

■ The Declaratory Judgments Act is not intended to provide a forum for establishing the legal relations between declaratory defendants and "all the world." (Opp. at 18.) Rather, the Act grants district courts the jurisdiction to "declare the legal rights and other legal relations of *any interested party.*" 28 U.S.C. § 2201 (emphasis added). Copyright misuse has already been asserted by Sharman as an affirmative defense, and the Court will reach all aspects of that issue if necessary. Separately litigating that defense in a declaratory posture would not serve the purposes of declaratory relief, such as clarifying and settling the legal relations of the *parties,* or affording a declaratory plaintiff relief from the "uncertainty, insecurity, and controversy giving rise to the proceeding." *Bilbrey v. Brown,* 738 F.2d 1462, 1470 (9th Cir.1984). Moreover, while concerns of federalism and comity are not present here, there are strong interests of judicial economy in avoiding needless duplication of these already elaborate proceedings. *See Huth,* 298 F.3d at 803; *Government Emples. Ins. Co. v. Dizol,* 133 F.3d 1220, 1226 (9th Cir.1998).

---

**2.** The Court does not reach the question whether this holding applies to copyright misuse, but rather assumes for purposes of this Motion that it does. The Court notes, however, that copyright misuse is an equitable doctrine distinct in many respects from the (generally) case-independent, binary question of patent validity. Accordingly, regardless the posture in which it is presented—whether under the ambit of declaratory relief or as an affirmative defense—the issue of copyright misuse may well be jurisdictionally moot upon a finding that the alleged infringer is not liable for infringement.

Accordingly, Sharman's counterclaim for declaratory relief as to copyright misuse is dismissed with prejudice.

### E. *Unfair Business Practices*

Finally, Sharman claims violations of California's unfair competition law ("UCL"), Cal. Bus. & Prof.Code §§ 17200 et seq. The UCL defines unfair competition as any "unlawful, unfair or fraudulent business act or practice[s]," and provides a private cause of action for equitable relief. Cal. Bus. & Prof.Code §§ 17200, 17203, 17204. Sharman argues that the alleged violations of antitrust law state a claim under the "unlawful" prong of Section 17200, and that its other allegations are cognizable under the "unfair" prong. (Opp. at 21–22.)

Given the broad sweep of Section 17200, the Court is inclined to deny the motion to dismiss this counterclaim. Even if Sharman's pleading is deficient with respect to some of the substantive elements of federal or state antitrust law, the UCL's prohibition on "unfair" business practices arguably brings within its radius conduct that might otherwise fall outside the strict confines of antitrust law. *See Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone,* 20 Cal.4th 163, 181, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999). "[T]he section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes of which the fertility of man's invention would contrive." *Cel–Tech Communications,* 20 Cal.4th at 181, 83 Cal.Rptr.2d 548, 973 P.2d 527.

However, because this claim was scarcely addressed in the moving papers (and was ignored entirely by Plaintiffs in their Reply), the Court reserves a final ruling and orders further briefing as detailed below.

## IV. LEAVE TO AMEND

Because the facts related to the question of antitrust standing are not in dispute, because Sharman has already once amended its counterclaims in response to Plaintiffs' identification of legal deficiencies, and because Sharman has not suggested any additional allegations that would alter the standing analysis, leave to amend is appropriately denied as to the federal and state antitrust claims. *See Associated Contractors,* 459 U.S. at 526 n. 11, 96 Lab.Cas. P 14028 (sustaining dismissal of antitrust claims where plaintiff had already once amended its complaint to attempt to state a claim); *Albrecht v. Lund,* 845 F.2d 193, 195–96 (9th Cir.1988) (dismissal without leave to amend appropriate where sole issue is liability as a matter of substantive law); *Orion Tire Corp. v. Goodyear Tire & Rubber Co.,* 268 F.3d 1133, 1138 (9th Cir. 2001) (court may properly consider facts alleged for the first time in the moving papers in determining whether to grant leave to amend).

## V. CONCLUSION

Therefore, Plaintiffs' Motion to Dismiss [444–1] must be, and hereby is, GRANTED IN PART as to Counts I through IV of Sharman's Counterclaims, and those counterclaims are DISMISSED WITH PREJUDICE.

Plaintiffs are ORDERED to file a Supplemental Reply, addressing Sharman's Opposition to the Motion to Dismiss as it applies to the UCL claim, which brief shall not exceed ten pages and shall be filed no later than Monday, July 14, 2003. Sharman may then file a Sur–Reply not to exceed ten pages, which brief shall be filed no later than Monday, July 21, 2003.

IT IS SO ORDERED.