39 F.3d 951
 63 USLW 2293, 1994-2 Trade Cases P 70,816
 LEGAL ECONOMIC EVALUATIONS, INC., a California Corporation,
Plaintiff-Appellant,
v.
METROPOLITAN LIFE INSURANCE COMPANY, et al., Defendants-Appellees.
IBAR SETTLEMENT CO., Plaintiff-Appellant,
v.
METROPOLITAN LIFE INSURANCE COMPANY; Transamerica
Occidental Life; Manufacturers Life; ML
Settlement Services, Inc.; National
Structured Settlements Trade,
Defendants-Appellees.
WEIL INSURANCE AGENCY, INC., a California Corporation dba
Jerry C. Weil & Associates, Plaintiff-Appellant,
v.
MANUFACTURERS LIFE, et al., Defendants-Appellees.
 Nos. 93-16007, 93-16028 and 93-16047.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 6, 1994.
Decided Nov. 2, 1994.
 
 Daniel J. Furniss and Timothy F. Perry, Townsend and Townsend Khourie and Crew, San Francisco, CA, for plaintiffs-appellants.
 Robert M. Mitchell, Seyfarth, Shaw, Fairweather & Geraldson (signed the briefs); Mark LeHocky, Weld, Freeland, Cooper & LeHocky (argued), San Francisco, CA, for defendants-appellees.
 Dale E. Fredericks, Darryl M. Woo, Sheppard, Mullin, Richter & Hampton, San Francisco, California, for defendants-appellees Ringler Insurance Agency and related Ringler agencies and Robert S. Bell.
 Appeals from the United States District Court for the Northern District of California.
 Before: SCHROEDER, FERGUSON and RYMER, Circuit Judges.
 RYMER, Circuit Judge:
 
 
 1
 These appeals require us to decide whether consultants who advise tort plaintiffs on structured settlements have suffered antitrust injury when they can't get information about premiums and rating practices from, or serve as brokers to arrange annuities to fund structured settlements with, life insurance carriers because of an alleged boycott by life insurance carriers and brokers who specialize in arranging annuities in behalf of tort defendants.
 
 
 2
 A structured settlement takes place when a tort defendant or its liability carrier purchases an annuity, with the tort plaintiff as the beneficiary, to settle a civil lawsuit. Legal Economic Evaluations, Inc., IBAR Settlement Co., and Weil Insurance Agency, Inc. (collectively Weil) are structured settlement consultants to tort plaintiffs. They have sued a number of life insurance carriers[1] and brokers[2] (Life Carriers and Brokers) under Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15, alleging that the Life Carriers and Brokers conspired to drive consultants and brokers for tort plaintiffs out of the annuity brokering business, thereby ensuring that only brokers for tort defendants would place annuities to fund structured settlements.
 
 
 3
 The district court granted summary judgment for Life Carriers and Brokers on the footing that if their policy harmed anyone, it was tort plaintiffs, and that the only possible injury was depriving tort plaintiffs of a stronger negotiating position in settlement negotiations. Weil Ins. Agency, Inc. v. Manufacturers Life Ins. Co., 815 F.Supp. 1320 (N.D.Cal.1992). Meanwhile, the court had declined to stay this action, at Weil's request, in deference to a state court action Weil had previously filed asserting a violation of the Cartwright Act, Cal. Bus. & Prof.Code Secs. 16720 and 16721.5, California's antitrust statute. Weil appeals both rulings.
 
 
 4
 We have jurisdiction, 28 U.S.C. Sec. 1291, and we hold that Weil's motion to stay was properly denied as federal jurisdiction over the Clayton Act claim is exclusive and the district court lacked discretion to abstain. With respect to its antitrust claim, Weil's injury from being unable to obtain information about tort defendants' annuity calculations, or to place annuities while consulting for tort plaintiffs, does not flow from the harm to competition it alleges: decreased annuity benefits to tort plaintiffs, and increased annuity costs to liability carriers. Nor has Weil suffered antitrust injury on account of being denied the business opportunity of working both sides of the street; the antitrust laws are concerned about injury to competition, not competitors. Because Weil has not shown antitrust injury, we affirm.
 
 
 5
 * For purposes of the summary judgment, the facts are not in dispute. During the late 1970s and early 1980s, parties to tort actions turned with increasing frequency to the structured settlement as a means of resolving their disputes. Rather than pay a lump-sum cash settlement, a tort defendant or its casualty insurer will purchase an annuity, with the tort plaintiff named as the beneficiary. A structured settlement has something to offer each party. For the defendant (or its liability carrier), the annuity may be cheaper than paying the plaintiff the present value of the stream of future payments. The tort plaintiff, in turn, receives the guarantee of predictable future payments. The plaintiff also obtains a tax advantage: The future payments are not taxable income, whereas the future income a plaintiff would receive from investing a lump-sum payment would be taxed. See I.R.C. Sec. 104(a)(2); Rev.Ruls. 79-200, 79-313.
 
 
 6
 The premium for an annuity is determined by applying the issuer's premium rate to the annuitant's age. The issuer may also apply a "rate-up" in quoting an annuity; this occurs when the issuer determines that the annuitant's chronological age does not reflect (in the issuer's judgment) the number of years that payments may be made, and the annuitant is given a "rated age" that corresponds to the issuer's estimation of her or his future longevity. Only a licensed broker is authorized to quote the cost of a given annuity.
 
 
 7
 Weil Insurance, Legal Economics and IBAR either lost business, or went out of business, as a result of the market differentiation that Weil attributes to a conspiracy by Life Carriers and Brokers to reduce the cost of structured settlements below the cash value of tort claims. In furtherance of this conspiracy, Life Carriers and Brokers blocked tort plaintiffs and their attorneys from gaining access to annuity price information, and boycotted companies, such as Weil, who were consulting with tort plaintiffs.
 
 
 8
 The complaint[3] alleges "two relevant product markets: (a) annuities sold to fund structured settlements of personal injury claims and (b) professional consulting services provided to (i) the injury victim and his/her attorney or (ii) the liability carrier regarding the use of annuities to fund structured settlements of personal injury claims." It then alleges that competition was injured in that the conspiracy among Life Carriers and Brokers depressed the consideration liability carriers paid to settle claims below the cash value of those claims; reduced the sale of annuities by withholding annuity information from tort plaintiffs, their counsel, and those who acted as their brokers, consultants, and agents; and produced a boycott of consultants and agents (such as Weil) who provided services to tort plaintiffs.
 
 II
 
 9
 Weil argues that it has shown antitrust injury because Life Carriers and Brokers acted with the purpose and effect of denying access to competition in the structured settlement brokerage and consulting market as well as access to the relationships with life insurers necessary to compete in those markets. In addition, Weil contends, the boycott suppressed information critical to the proper competitive working of the structured settlement market place; distorted the price paid by property and casualty companies for structured settlement annuities; and reduced the number of structured settlement annuities that were consummated.
 
 
 10
 Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Weil first argues that it satisfies this standard as the injury it has suffered--elimination as a market competitor--is the type of harm that antitrust scrutiny of group boycotts is designed to prevent. This, however, does not suffice. Exclusion of a competitor may be a necessary condition to finding that a group boycott or refusal to deal violates the antitrust laws, but it is not a sufficient condition for finding antitrust injury. Otherwise, antitrust injury would be presumed whenever the challenged practice is per se illegal and, as Weil concedes, it is not. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341-45, 110 S.Ct. 1884, 1893-95, 109 L.Ed.2d 333 (1990). The antitrust laws were enacted for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962); see also United States v. Syufy Enters., 903 F.2d 659, 668 (9th Cir.1990) (same). Therefore, the private plaintiff must link its own injury to the anticompetitive aspect of the defendants' conduct. ARCO, 495 U.S. at 339, 110 S.Ct. at 1891-92.
 
 
 11
 Weil argues that it has done so, since its injuries are the same as the Court identified in Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), as the two major anticompetitive problems that group boycotts may produce: they may "disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle[,]" and, related to this concern, a group boycott may "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete." Id. at 294, 105 S.Ct. at 2619 (quotation marks omitted). Northwest Stationers, however, does not say that these factors represent the harm to competition from which antitrust injury must flow; rather, it identifies them as characteristics common to past group boycott cases in which a per se rule had been applied. Indeed, the Court held that concerted activity need not necessarily result in anti-competitive effects. Id. at 295-96, 105 S.Ct. at 2620-21.
 
 
 12
 The difficulty with Weil's case is that its injury does not match either the mischief about which it complains or the markets in which it occurred. Weil argues that the defense-only policy has produced a market for brokering and consulting services in which there is no competition "at the point of sale." This comes about because Weil believes there is little incentive on the defense-only broker's part to achieve a more favorable rate for the liability carrier by shopping among Life Carriers who charge different rates for comparable annuities, or to obtain a more favorable payout for the tort plaintiff. Assuming this to be true, the alleged harm to competition--decreased annuity benefits to tort plaintiffs and increased annuity costs to liability carriers--nevertheless occurs in markets in which Weil does not compete. Weil is neither a liability carrier nor a tort plaintiff. Thus, even if price fixing of structured settlements injures tort plaintiffs, and restriction on output increases the cost of annuities and thereby injures Life Carriers, Weil's injury does not flow from these competitive harms.
 
 
 13
 In reality, of course, tort plaintiffs, whom Weil represents, are litigation competitors of liability carriers. If liability carriers, who purchase annuities, are not getting their money's worth, that is not an injury of concern to the antitrust laws. There is no evidence that liability carriers are stuck with a limited number of brokers, or are unable to comparison-shop; if they chose not to do so or chose to buy a higher-priced product for whatever the reason, it is not for Weil, or the anti-trust laws, to protect them from themselves. Likewise, even if tort plaintiffs as a class are worse off because a plaintiff's broker might be able to find a better deal, their harm flows from what makes a structured settlement economically attractive, not from anticompetitive conduct. Tort plaintiffs do not purchase annuities to fund structured settlements because they would lose the tax advantages that are available only when the annuities are bought by defendants. Cf. Yellow Pages Cost Consultants v. GTE Directories Corporation, 951 F.2d 1158 (9th Cir.1991) (client placed business with consultant's help with GTE), cert. denied, --- U.S. ----, 112 S.Ct. 1947, 118 L.Ed.2d 552 (1992). In any event, to the extent that tort plaintiffs are harmed, that harm arises in the market for settling litigation.
 
 
 14
 Weil's argument that the defense-only policy eliminated an entire class of competitors (those who write annuities to fund structured settlements while representing tort plaintiffs) is similarly misplaced. Annuities are still being placed and brokers are still writing that business. Plaintiff-side brokers are not writing the business, but "[i]t is injury to the market or to competition in general, not merely injury to individuals or individual firms that is significant." McGlinchy v. Shell Chem. Co., 845 F.2d 802, 812 (9th Cir.1988). By the same token, there is no diminution of competition among those who wish to represent tort plaintiffs on account of Life Carriers and Brokers' defense-only policy. None has access to more information about Life Carriers' rating practices than any other; conversely, all would be out of the consulting business if the same information were freely available to both tort defendants (who do the buying) and tort plaintiffs (who are the beneficiaries). In this sense the differentiated market has created a new breed of competitor, such that the choice of whether to consult for tort plaintiffs or to broker for tort defendants lacks anticompetitive consequence.
 
 
 15
 Nothing in Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), upon which Weil relies, suggests otherwise. The plaintiff in that case, a member of defendant's health plan, brought an antitrust suit against the plan on account of its policy of reimbursing psychiatrists, but not clinical psychologists, for psychotherapy services. The plaintiff alleged an unlawful conspiracy between the plan and the psychiatrists' association to boycott psychologists. The Court held that the plaintiff satisfied the antitrust injury requirement, since her injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." Id. at 484, 102 S.Ct. at 2551. Weil asserts that it is in the same position as the plaintiff in McCready: Like the McCready plaintiff who faced a "Hobson's choice" of either settling for a doctor she did not wish to see or visiting the psychotherapy specialist of her choice (and forgoing reimbursement), id. at 483, 102 S.Ct. at 2550, Weil either had to join the conspiracy and give up work for the clients of its choice or had to resist the conspiracy and give up profits from performing work for tort plaintiffs. McCready is, however, different. Because the McCready plaintiff was a consumer in the market for psychotherapy services, the ultimate harm from the conspiracy would be borne by her either directly (by having to pay more for those services) or indirectly (by having fewer options). In either event, the harm would have been borne in the same market (for psychotherapy services). Weil, by contrast, stands to suffer harm in the market for brokerage or consulting services--either by limiting its choice of clients or receiving less in fees; but the asserted harm to competition takes place in different markets, for settling lawsuits or selling annuities.
 
 
 16
 Because we conclude that Weil has failed to show that its losses flow from injury to competition in the relevant market, we do not reach Life Carrier and Brokers' alternative theories having to do with aspects of the legal process which they offer in support of the district court's judgment.
 
 III
 
 17
 Weil contends that the district court erred in refusing to stay the federal proceedings pending the outcome of its state court proceedings pursuant to Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The district court followed binding Ninth Circuit precedent which precludes Colorado River abstention where federal jurisdiction is exclusive. See Minucci v. Agrama, 868 F.2d 1113, 1115 (9th Cir.1989) (Copyright Act); Turf Paradise, Inc. v. Arizona Downs, 670 F.2d 813, 821 (9th Cir.) (Sherman Act), cert. denied, 456 U.S. 1011, 102 S.Ct. 2308, 73 L.Ed.2d 1308 (1982). The court correctly found inapplicable the case Weil relies on, Attwood v. Mendocino Coast Dist. Hosp., 886 F.2d 241 (9th Cir.1989), because federal and state courts enjoy concurrent jurisdiction over the statute in issue there, 42 U.S.C. Sec. 1983.
 
 
 18
 Weil argues that its case is distinguishable from Minucci and Turf Paradise because the application for a stay in this case was made by the federal plaintiff in an effort to preserve its rights to litigate in its forum of second choice. Weil points out that the Court in Colorado River supported its statement concerning "the virtually unflagging obligation of the federal court to exercise the jurisdiction given them," 424 U.S. at 817, 96 S.Ct. at 1246, with a citation to England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 415, 84 S.Ct. 461, 464-65, 11 L.Ed.2d 440 (1964). The Court in England, in turn, stated that "[t]he right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." Id. (quotation marks omitted). Because the Court in England was concerned that a plaintiff should not ordinarily be deprived of her or his choice to litigate a federal claim in federal court, Weil argues that the Colorado River language about the federal courts' obligation to hear federal claims is inapplicable where a plaintiff seeks a stay of the federal proceedings.
 
 
 19
 This argument fails. While it is true that England was concerned with protecting a plaintiff's right to litigate in federal court, nothing in that case or in Colorado River suggests that a plaintiff may hedge its bets by filing a federal claim in federal court, placing that claim on hold, and taking a shot with an analogous cause of action in state court.
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 The named life insurance carriers are: The Manufacturers Life Insurance Company, Alexander Hamilton Life Insurance Company of America, Metropolitan Life Insurance Company, New York Life Insurance Company, Transamerica Occidental Life Insurance Company, First Colony Life Insurance Company, Safeco Life Insurance Company, United Pacific Life Insurance Company, Allstate Life Insurance Company, American International Life Assurance Company of New York, The Prudential Life Insurance Company, and Integrity Life Insurance Company
 
 
 [2]
 The named brokers were: Ringler Insurance Agency (together with a number of Ringler-associated agencies), Kenneth H. Wells & Associates, Inc., ML Settlement Services, Inc., The Structured Settlements Company, and Galaher Settlements and Insurance Services Co., Inc
 The complaint also names as a defendant the National Structured Settlements Trade Association (NSSTA), a private trade association whose members included all the life carriers and brokers named in the complaint.
 ML Settlement Services and Kenneth H. Wells & Associates have settled with Weil and are not parties to this appeal.
 
 
 [3]
 Our reference to "the complaint" encompasses the allegations common to all three pleadings