354 F.Supp.2d 1113 (2005)
In re NAPSTER, INC. COPYRIGHT LITIGATION
UMG Recordings, Inc., et al. Plaintiffs,
v.
Hummer Winblad Venture Partners, et al., Defendants.
Nos. C MDL-00-1369-MHP, C 04-1166-MHP.
United States District Court, N.D. California.
February 3, 2005.
*1115 Glenn D. Pomerantz, Kelly M. Klaus, Munger, Tolles & Olson LLP, Stephen D. Alexander, Fried, Frank, Harris, Shriver & Jacobson, Richard Stephen Busch, Robins, Kaplan, Miller & Ciresi LLP, Los Angeles, CA, Peter L. Simmons, Fried, Frank, Harris, Shriver & Jacobson, Theodore Kevin Cheng, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City, Paul Hamilton Duvall, King & Ballow, San Diego, CA, for Plaintiffs.
Ragesh K. Tangri, John Watkins Keker, Ravind Singh Grewal, Keker & Van Nest LLP, San Francisco, CA, for Defendants.
Michael H. Page, Keker & Van Nest, San Francisco, CA, for Defendants and Claimants.

MEMORANDUM AND ORDER

Re: Motion to Dismiss Defendants' Counterclaims
PATEL, District Judge.
This action arises from the litigation related to the alleged copyright infringement by Napster, Inc. On April 21, 2003, plaintiffs UMG Recordings, Inc. and twelve other record labels (collectively "plaintiffs") filed this action in the United States District Court for the Central District of California alleging that defendants Hummer Winblad Venture Partners, various related Hummer Winblad entities, and two Hummer Winblad partners (collectively "Hummer") engaged in contributory and vicarious copyright infringement by virtue of their investment in and control of Napster. Plaintiffs' complaint also alleges a number of related state law causes of action. The action was subsequently transferred to this court pursuant to 28 U.S.C. § 1407. Now before the court is plaintiffs' motion to dismiss Hummer's counterclaims, which assert violations of federal and state antitrust laws, see 15 U.S.C. § 1 et seq; Cal. Bus. & Prof. § 16700 et seq., as well as alleging that plaintiffs engaged in unfair business practices in violation of California Business and Professions Code § 17200 et seq. Having considered the arguments presented and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND[1]
The various Hummer Winblad entities named as defendants are limited partnerships *1116 or limited liability companies formed for the purpose of making venture capital investments in select companies nationwide. Among the companies that Hummer invested in was Napster, a Delaware corporation that operated the eponymous "peer-to-peer" network for the online distribution of music before ceasing operations in July 2001. In May 2000, Hummer invested approximately $13 million in Napster and received a significant ownership interest in the company. In addition, defendant Hank Barry, a Hummer partner, served as a director and chief executive officer ("CEO") of Napster; a second Hummer partner, defendant John Hummer, also served on Napster's board of directors.
Each of the thirteen plaintiffs in this action is a record label that produces, manufactures, distributes, sells, and licenses the distribution and sale of sound recordings in phonorecords. See 17 U.S.C. § 101. Plaintiffs collectively own the copyrights to "thousands of copyrighted 0sound recordings." Pls.' Compl. ¶ 27. On December 6, 1999, eighteen record labels (including a number of the plaintiffs in the instant action) filed an action against Napster in this court, alleging that the company's peer-to-peer filesharing network enabled the online distribution of the record labels' copyrighted sound recordings without their consent. See generally A&M Records, Inc. v. Napster, Inc. ("Napster I"), 114 F.Supp.2d 896 (N.D.Cal.2000) (Patel, C.J.). The labels asserted that the alleged conduct constituted contributory and vicarious infringement of their copyrights in violation of their exclusive rights under section 106 of the Copyright Act, 17 U.S.C. § 106. On August 10, 2000, this court entered an order preliminarily enjoining Napster from "engaging in, or facilitating others in copying, downloading, uploading, transmitting, or distributing plaintiffs' copyrighted musical compositions and sound recordings ... without express permission of the rights owner." Id. at 927.
On appeal, the Ninth Circuit affirmed this court's conclusion that the record labels had demonstrated a substantial likelihood of prevailing on the merits of their causes of action for contributory and vicarious copyright infringement. See A&M Records, Inc. v. Napster, Inc. ("Napster II"), 239 F. 239 F.3d 1004, 1022, 1024 (9th Cir.2001). The Ninth Circuit remanded with instructions to modify certain aspects of the preliminary injunction, and this court entered an order consistent with the Ninth Circuit's instructions on March 5, 2001. See A & M Records, Inc. v. Napster, Inc. ("Napster III"), No. C MDL-00-1369 MHP, 2001 WL 227083 (N.D.Cal. Mar. 5, 2001). After concluding that it was not technologically feasible to comply with this court's order and continue operating its file sharing network, Napster ceased operations on July 1, 2001. Napster subsequently filed for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq.
On April 21, 2003, plaintiffs filed this action in the United States District Court for the Central District of California. On March 24, 2004, the action was transferred to this court for pretrial proceedings by order of the Judicial Panel on Multidistrict Litigation. See 28 U.S.C. § 1407. As in Napster I, plaintiffs' complaint asserts that Napster users infringed their exclusive rights in numerous copyrighted sound recordings and that Napster enabled this infringement by providing an integrated network for the online distribution of "MP3"-formatted music files. Pls.' Compl. ¶ 30. In addition, plaintiffs now allege that by virtue of its investment in and control of Napster's operations during the period from May 2000 to July 2001, Hummer engaged in contributory and vicarious infringement of plaintiffs' copyrighted *1117 sound recordings, thereby violating plaintiffs' exclusive rights under 17 U.S.C. § 106. Plaintiffs' complaint also asserts causes of action for common law misappropriation, Cal. Civ.Code § 980(a)(2), unfair competition in violation of California Business and Professions Code § 17200 and the common law of California, and civil conspiracy.
On August 13, 2004, Hummer answered plaintiffs' complaint and asserted various counterclaims related to plaintiffs' alleged anticompetitive behavior. Specifically, Hummer's counterclaims allege that plaintiffs conspired to exclude Napster and other independent music distributors from the online music distribution market. Hummer also asserts that plaintiffs participated in "the market for[ ] financing online recorded music distribution companies" and that they conspired to exclude unaffiliated financing entities from that market. Defs.' Countercl. ¶ 38. Based on these allegations, Hummer asserts causes of action for conspiracy in restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, for violations of California antitrust laws ("the Cartwright Act"), Cal. Bus. & Prof.Code §§ 16726, 16750, and for unfair competition in violation of California Business and Professions Code § 17200 et seq. Now before the court is plaintiffs' motion to dismiss Hummer's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). In moving to dismiss, plaintiffs argue that Hummer lacks standing to maintain a private antitrust enforcement action under federal or state law. Plaintiffs also assert that this lack of standing dooms Hummer's unfair competition claim and thus urge the court to dismiss Hummer's counterclaims in their entirety.

LEGAL STANDARD
A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir.2001). "[U]nless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied. Lewis v. Telephone Employees Credit Union, 87 F.3d 1537, 1545 (9th Cir.1996) (citation omitted); see also Conley v. Gibson, 355 U.S. 41, 45^6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When assessing the legal sufficiency of a plaintiffs claims, the court must accept as true all material allegations of the complaint, and all reasonable inferences must be drawn in favor of the non-moving party. See, e.g., Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir.1996) (citations omitted). Dismissal is proper under Rule 12(b)(6) "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Navarro, 250 F.3d at 732 (quoting Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.1988)).

DISCUSSION

I. Sherman Act

The first question presented by plaintiffs' motion to dismiss is whether Hummer has standing to bring a private action to enforce section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 prohibits "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade among the several States, or with foreign nations." Id. Although the Sherman Act provides only for governmental enforcement of antitrust laws, section 4 of the Clayton Act authorizes the award of treble damages to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). "This provision is quite broad, and if `read literally, could afford relief to all persons whose injuries are causally related to an antitrust violation.'" American Ad Mgmt., Inc. v. General Tel. Co. of Cal., 190 F.3d 1051, *1118 1054 (9th Cir.1999) (quoting Amarel v. Connell, 102 F.3d 1494, 1507 (9th Cir. 1996)) (original alteration omitted). Recognizing that this literal reading of the Clayton Act is inconsistent with Congress' intent in enacting the statute, the Supreme Court has required plaintiffs seeking to bring private antitrust actions to plead and prove "antitrust standing," a prudential requirement that is based upon "the plaintiffs harm, the alleged wrongdoing by the defendants, and the relationship between them." Id. (quoting Associated Gen. Contractors of Cal, Inc. v. California State Council of Carpenters, 459 U.S. 519, 535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). The Ninth Circuit has held that this determination is a "question of law, defining the limits to which private treble damage actions may be brought for injuries caused in fact by the violation of the antitrust laws." Bubar v. Ampco Foods, Inc., 752 F.2d 445, 449 (9th Cir.), cert. denied, 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985).
In Associated General Contractors, the Supreme Court identified a number of factors for determining whether a plaintiff who has borne an injury has antitrust standing. These factors include:
(1) the nature of the plaintiffs alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;
(2) the directness of the injury;
(3) the speculative measure of the harm;
(4) the risk of duplicative recovery; and
(5) the complexity in apportioning damages.
Associated Gen. Contractors, 459 U.S. at 535, 103 S.Ct. 897; see also American Ad Mgmt., 190 F.3d at 1054 (citing same factors). In moving to dismiss Hummer's counterclaims, plaintiffs' arguments focus on the first of these five factors, arguing that Hummer allegations fail to establish that it has suffered "antitrust injury" i.e., the type of injury that "the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Thus, because "antitrust laws were enacted for `the protection of competition, not competitors,'" a private antitrust claim must allege an injury that results from the anticompetitive aspect of the defendants' conduct. Legal Econ. Evaluations, Inc. v. Metropolitan Life Ins. Co., 39 F.3d 951, 954 (9th Cir.1994) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)) (original emphasis omitted), cert. denied, 514 U.S. 1044, 115 S.Ct. 1420, 131 L.Ed.2d 304 (1995).
There is no doubt that if Hummer's counterclaims were brought by Napster itself (or its trustee in bankruptcy), the company would have standing under section 4 of the Clayton Act. In particular, Hummer alleges that plaintiffs conspired to cartelize the network for online music distribution by refusing to license their copyrighted works to unaffiliated entities and by using "captive joint ventures to effect a price-fixing arrangement among horizontal competitors in the [market for] wholesale distribution of recorded music in digital form." Defs.' Countercl. ¶ 25. If proven, these allegations would give rise to per se violations of the Sherman Act. See National Collegiate Athletic Ass'n v. Board of Regents of the Univ. of Okla., 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("Horizontal price fixing and output limitation are ordinarily condemned as a matter of law under an `illegal per se' approach because the probability that these practices are anticompetitive is so high ...."); see also FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 431-32, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (holding that concerted refusal to deal is per se unlawful when used to enforce *1119 a horizontal price fixing agreement). Hummer's counterclaims further allege that as a direct consequence of plaintiffs' unlawful conduct, Napster was unable to obtain licenses to distribute plaintiffs' copyrighted works on reasonable terms, leading the company to cease operations on July 1, 2001. See Defs.' Countercl. ¶¶ 33-35. Based on these well-pleaded facts, the court would have no trouble concluding that Napster's injuries were directly and proximately caused by plaintiffs' anticompetitive conduct.
However, neither Napster nor its trustee in bankruptcy is a party to this action. Rather, it is Hummer that must establish its standing to sue under section 4 of the Clayton Act, and plaintiffs assert that it is unable to do so because unlike Napster, it never directly competed with them in the online music distribution market. Hummer counters this assertion with two arguments. First, Hummer contends that it has antitrust standing because as an investor in Napster, the harm that it suffered from plaintiffs' conspiracy to restrain trade in the online music distribution market was "inextricably intertwined" with the antitrust injury that plaintiffs inflicted upon Napster. Alternatively, Hummer argues that it has standing by virtue of its participation in the market for financing online music distribution ventures and its allegations that plaintiffs conspired to exclude unaffiliated competitors from that market. The court considers each of these arguments below.

A. The Online Music Distribution Market

Hummer's first argumentthat it has antitrust standing by virtue of its participation in the online music distribution marketrelies primarily on the Supreme Court's decision in Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In that case, one of Blue Shield's insureds sought to obtain treatment for a mental disorder. Id. at 468, 102 S.Ct. 2540. The insurer refused to provide coverage for these services on the ground that they had been provided not by a psychiatrist, but by a non-physician psychologist. Id. The insured challenged this practice, claiming that Blue Shield and the NeuroPsychiatric Society of Virginia had engaged in an unlawful conspiracy in violation of section 1 of the Sherman Act. Id. at 468-69, 102 S.Ct. 2540. The Court held that the insured had standing to bring a private antitrust action, observing that "[although McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." Id. at 483-84, 102 S.Ct. 2540.
McCready is distinguishable from the instant case because the plaintiff was a consumer in the mental health services market affected by the alleged restraint of trade. At times, the Ninth Circuit has appeared to hold that "[a] plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury." Vinci v. Waste Mgmt., Inc. ("Vinci II"), 80 F.3d 1372, 1376 (9th Cir. 1996) (quoting In re Ins. Antitrust Litig., 938 F.2d 919, 926 (9th Cir.1991)) (original alterations and quotation marks omitted), cert. denied, 520 U.S. 1119, 117 S.Ct. 1252, 137 L.Ed.2d 333 (1997). However, the court recognized an exception to this general rule in Ostrofe v. H.S. Crocker Co., 740 F.2d 739 (9th Cir.1984), cert. dismissed, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). The Ostrofe court held that an employee who was fired after he refused to cooperate in a price fixing conspiracy had standing to bring an antitrust action against his former employer and its alleged co-conspirators. Id. at 745-46. The court reasoned that the plaintiff had suffered injury within the *1120 meaning of section 4 of the Clayton Act because "his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme." Id. at 746 (citing Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 766, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)).
The Ninth Circuit has subsequently interpreted Ostrofe narrowly, essentially limiting its holding to the facts of that case. See Vinci II, 80 F.3d at 1376. Nonetheless, in American Ad Management, the court once again recognized that its past decisions have refused to apply a bright-line rule in determining whether a plaintiff has antitrust standing, observing that "it is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged conduct and the resulting harm to plaintiff." 190 F.3d at 1058 (citing Amarel, 102 F.3d at 1508): Accordingly, the antitrust injury inquiry must focus on whether the plaintiff has suffered the alleged injury "in the market where competition is being restrained." Id. at 1057. The American Ad Management court further noted that while consumers and competitors are most likely to satisfy this requirement, "there are situations in which other market participants can suffer antitrust injury." Id. Among the "other market participants" cited by the court are indirect purchasers, potential entrants, suppliers, licensors, landlords, and dealers. Id. (citing Areeda & Hovenjkamp, Antitrust Law §§ 371, 362c, 374-76 (1995 & 1998 Supp.)).
Notably absent from this list of "market participants" are shareholders of corporations or other investors who do not participate directly in the market where competition has allegedly been restrained. Indeed, the Ninth Circuit has consistently held that "[a] shareholder of a corporation injured by antitrust violations has no standing to sue in his or her own name." Vinci II, 80 F.3d at 1375 (quoting Solinger v. A & M Records, Inc. ("Solinger II"), 718 F.2d 298, 299 (9th Cir.1983)) (original alterations omitted); see also Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 439 (9th Cir.1979) (holding that injury to corporation does not confer antitrust standing on its sole shareholder). The discussion of shareholder standing in Stein v. United Artists Corp., 691 F.2d 885 (9th Cir.1982), is particularly apposite here. In that case, the majority shareholder of a motion picture theater operator brought an antitrust action against various motion picture distributors, alleging that the distributors conspired to drive him out of the theater business. Id. at 888-89. The court held that the plaintiffs status as a shareholder was insufficient to confer standing to sue for damages under section 4 of the Clayton Act despite the fact that the plaintiff had alleged that one aim of the conspiracy was "to drive him out of the industry as a shareholder." Id. at 897. In so holding, the court relied primarily on the desire to avoid duplicative recovery of damages, observing:
The prohibition against shareholder standing in the above cases is premised on the prohibition against duplicate recovery, in addition to considerations of remoteness. If the corporation is injured by an antitrust conspiracy or violation, the corporation is the proper party to sue, and injured shareholders and creditors of the corporation recover their losses from the corporation's recovery, as it is distributed or as reflected in stock prices. If shareholders were permitted to recover their losses directly, there would be the possibility of a double recovery, once by the shareholder and again by the corporation.
Id. at 896-97 (citations omitted).
In spite of these concerns, some courts have recognized an exception to the rule *1121 against shareholder standing where there is such a unity of interest and ownership that piercing the corporate veil is appropriate. See John Peterson Motors, Inc. v. General Motors Corp., 613 F.Supp. 887, 901-02 (D.C.Minn.1985); see also Stepp v. Ford Motor Credit Co., 623 F.Supp. 583, 589 (D.C.Wis.1985). For example, in John Peterson Motors, the court held that the sole shareholder, president, and major creditor of a car dealership had standing to bring an antitrust action based on allegations of injury suffered by the dealership. 613 F.Supp. at 902.
Admittedly, the Ninth Circuit has never held that this veil-piercing theory is sufficient to establish antitrust injury, and a number of its decisions leave little doubt that shareholder status cannot by itself confer antitrust standing on an investor. See, e.g., Vinci II, 80 F.3d at 1375; Stein, 691 F.2d at 896-97. Nonetheless, as that court observed in Amarel, the antitrust standing inquiry "involves a case-by-case analysis of `the plaintiffs harm, the alleged wrongdoing by the defendants, and the relationship between them.'" 102 F.3d at 1507 (quoting Associated Gen. Contractors, 459 U.S. at 535, 103 S.Ct. 897). The veil-piercing rationale on which the John Peterson Motors court relied is merely one manifestation of the fact-intensive nature of the inquiry into a particular plaintiffs allegations of antitrust injury. The recognition of the need to conduct such a case-by-case inquiry is entirely consistent with Ninth Circuit law. Accordingly, this court concludes that where there is such a unity of ownership of interest and ownership between a corporation and one or more of its investors that any injury to the corporation is in fact suffered by the investor, the investor may have standing to assert an antitrust claim against a direct competitor of the corporation.
Like the court in John Peterson Motors, this court recognizes that situations where a shareholder "may so dominate the corporation as to be its alterego[] are rare and will not subvert the general rules against shareholder standing." 613 F.Supp. at 902 n. 18; see also D.L. Auld Co. v. Park Electrochemical Corp., 651 F.Supp. 582, 585-86 (E.D.N.Y. 1986) (distinguishing John Peterson Motors). Nonetheless, in light of the procedural posture of this motion, Hummer need only establish that the facts alleged in the pleadings support a reasonable inference that it has suffered a cognizable antitrust injury. As the court observed in its July 14, 2004 order denying Hummer's motion to dismiss, plaintiffs have alleged that Hummer had "essentially full operational control" over Napster during the period from May 2000 to July 2001. UMG Recordings, Inc. v. Bertelsmann AG ("Napster V"), 222 F.R.D. 408, 413 (2004). Such allegations are consistent with a unity of interest and ownership between the two corporations of the type that would justify piercing the corporate veil under an alter ego theory. Cf. Laird v. Capital Cities/ABC, Inc., 68 Cal.App.4th 727, 742, 80 Cal.Rptr.2d 454 (1998) ("To justify piercing the corporate veil on an alter ego theory in order to hold a parent corporation liable for the acts or omissions of its subsidiary, a plaintiff must show that there is such a unity of interest and ownership between the two corporations that their separate personalities no longer exist, and that an inequitable result would follow if the parent were not held liable.") (citation omitted). Thus, as in John Peterson Motors, the allegations here are, if proven, sufficient to establish that Hummer suffered antitrust injury as a result of plaintiffs' anticompetitive conduct. See 613 F.Supp. at 902.
The court also notes that the policy concerns that the Ninth Circuit has emphasized in limiting the availability of shareholder standing are simply not present *1122 here. In particular, where, as here, the corporation that would otherwise have standing to sue its competitor has been liquidated following bankruptcy proceedings, there is no possibility that a defendant might be subject to multiple obligations arising from the separate antitrust claims of the corporation and its shareholders. Cf. Ostrofe, 670 F.2d at 1385 (observing that the absence of any "danger of duplicative recovery" favored permitting a former employee to bring a Sherman Act claim against his former employer). While not dispositive, the absence of any risk that plaintiffs will be subjected to multiple obligations lends further weight to the court's conclusion that resolution of the issues raised by plaintiffs' motion must await summary judgment or trial. Indeed, if plaintiffs are found to have engaged in anticompetitive conduct in violation of the antitrust laws and by that conduct successfully wiped out a competitor, they would not have to worry about answering in damages for any of the losses caused either to the competitor or its investors or principals. This hardly serves the purposes of the antitrust laws nor does it address the concerns of Stein. Based on the pleadings at this stage of the proceedings, the court holds that Hummer has met the requirements for pleading antitrust standing.

B. The Market for Financing Online Music Distribution Ventures

Having concluded that the allegations in the pleadings are sufficient to establish Hummer's antitrust standing, the court must deny plaintiffs' motion to dismiss Hummer's Sherman Act counterclaim. The court nonetheless finds it appropriate to clarify the issues raised by the other basis for antitrust standing that Hummer has asserted. Under this alternative theory, Hummer claims to have suffered antitrust injury by virtue of its participation in the market for "the financing of online recorded music distribution ventures." Defs.' Countercl. ¶ 45. Hummer contends that it suffered two types of injuries from plaintiffs' alleged conspiracy to monopolize this market. The first type of injury, the loss of its $13 million investment in Napster, is entirely derivative of its status as a Napster investor and was thus addressed in Part LA of this order. However, Hummer also alleges that it "refrained from making other investments in the online distribution space out of fear ... of being targeted by the anticompetitive and unlawful acts of plaintiffs and their co-conspirators." Id. ¶ 40.
Although Hummer alleges that it incurred this second type of injury as a consequence of its participation in the market for financing online music distribution ventures, the nature of Hummer's injury can just as aptly be characterized as arising from its status as a potential investor in as-yet-to-be formed participants in the online music distribution market. Viewed in this light, Hummer's allegations are materially indistinguishable from the type of harm that the Ninth Circuit concluded was not sufficient to confer antitrust standing in Bubar v. Ampco Foods., Inc., 752 F.2d at 445. The plaintiffs in that case were a group of potential minority shareholders who sought to form a corporation for the purpose entering the potato processing market in the Pacific Northwest. Id. at 446. Although the plaintiffs had entered into negotiations to purchase the assets of an existing potato-processing facility and had taken steps to obtain venture capital financing for their purchase, the processor ultimately agreed to sell its assets to Ampco, a competitor in the processed potato market. See id. at 447-48. The plaintiffs responded by suing Ampco for violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. Id.
The court began its antitrust standing analysis by observing that the Ninth Circuit, "along with most circuits, has held *1123 that a potential competitor has standing if he can show a genuine intent to enter the market and a preparedness to do so." Id. at 450 (citing Solinger v. A & M Records, Inc. ("Solinger I"), 586 F.2d 1304, 1309-10 (9th Cir.1978)); see also American Ad Mgmt., 190 F.3d at 1057 (citing a "potential entrant[]" as an example of a "market participant" having standing to bring private antitrust action). However, the court noted that a potential competitor in a market differs from a prospective shareholder in a corporation that might be formed for the purpose of participating in that market. See id. at 451. While conceding that the latter also differed from the typical shareholder standing case because the prospective shareholder cannot rely on the corporation to bring suit in its own name, the court observed that the same "policy factors" that underlie the prohibition on shareholder standing will generally preclude prospective shareholders from maintaining private antitrust actions. See id. at 451, 453. In particular, the court observed that "the fact that the corporation had not been formed and that it had not been determined who all of the stockholders were to be, what the percentage of ownership was to be, what the stock rights were to be, and when or if additional stock was to be issued to the management group, magnifies the problems with regard to the complexity of damage calculations and the risk of duplicative recovery." Id. at 451. The court also noted that the harm suffered by the plaintiffs was speculative because they "were only prospective minority shareholders in the corporation that was to be the competitor, and the distribution of the stock and of the relative stock rights was uncertain." Id. at 453. Likewise, the fact that the injury would in any event be suffered by the corporation and only indirectly by its shareholders weighed against allowing the plaintiffs to pursue their claims. Id. Applying these factors, the court concluded that the plaintiffs had no standing to maintain a private antitrust action by virtue of their status as prospective shareholders in a corporation that has yet to be formed and granted summary judgment to that effect. Id. at 454.
In the instant action, Hummer attempts to avoid Bubar's general rule against prospective shareholder standing by asserting that plaintiffs' conspiracy was directed in part at the market for financing online music distribution services, a market in which Hummer allegedly participated. While the court is bound to accept the facts alleged in Hummer's counterclaims as true for the purposes of adjudicating this motion, it is under no obligation to accept the nomenclature that Hummer uses to describe its legal theories. Indeed, to permit such pleading to avoid the well-established limitations on shareholder standing that are imposed by Ninth Circuit law would undermine the very policies on which those limitations are based: namely, the indirect nature of the shareholder's injury, the complexity of apportioning damages between the shareholder and the corporation, and the risk of duplicative recovery. See Bubar, 752 F.2d at 453; Stein, 691 F.2d at 896-97. As the Bubar court observed, these problems are only magnified when the plaintiff is a prospective shareholder of a potential competitor rather than someone who actually has an ownership interest in an existing market participant. See 752 F.2d at 451. Accordingly, the court holds that it must apply the "prospective shareholder" analysis of Bubar in evaluating Hummer's claim to have standing by virtue of its participation in the market for financing online music ventures.
In light of this conclusion, the court holds that it must reject Hummer's attempt to plead antitrust injury based on this theory. In Bubar, the plaintiffs had identified specific assets that they wished *1124 to purchase, had entered into negotiations with the owners of those assets, and had taken steps to obtain the financing necessary to fund their purchase. Id. at 447-48. The court nonetheless held that they lacked standing to pursue an antitrust claim against the eventual purchaser. Id. at 454. In contrast, Hummer alleges only that it was dissuaded from making unspecified future investments in the online distribution market out of fear that it would be targeted by plaintiffs' anticompetitive conduct. Defs.' Countercl. ¶ 40. The counterclaims neither state the nature of the investments that Hummer had planned to make nor disclose any steps that it had taken in preparation for doing so. Cf. Bubar, 752 F.2d at 450. Simply put, the antitrust laws are not intended to provide a remedy for such speculative assertions of injury.[2]
Admittedly, the procedural posture of the instant case differs from that of Bubar in that plaintiffs' challenge to Hummer's antitrust standing comes before the court on a motion to dismiss rather than a motion for summary judgment. While the court is mindful of this fact, it is nonetheless the case that a claimant in a private antitrust action "must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail" to avoid dismissal for failure to state a claim. Les Shockley Racing v. National Hot Rod Ass'n, 884 F.2d 504, 508 (9th Cir.1989) (citing Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 736 (9th Cir.1987)). Because Hummer's allegations that it lost the opportunity to make unidentified future investments in the market for online music distribution fail to meet even this minimum standard, its Sherman Act counterclaim fails as a matter of law to the extent that it relies on such allegations.[3]

*1125 II. Cartwright Act

Hummer also alleges violations of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., asserting that it has been injured by plaintiffs' "refusal to deal, unduly restrictive and exclusive licensing provisions, unlawful horizontal pooling of their copyrights, ... price-fixing agreements, and other anticompetitive acts." Defs.' Countercl. ¶ 48. Although somewhat different in its statutory wording, the Cartwright Act, like the Sherman Act, "was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade." Exxon Corp. v. Superior Court, 51 Cal.App.4th 1672, 1680, 60 Cal.Rptr.2d 195 (1997). As with federal antitrust laws, the Cartwright Act requires that a plaintiff have antitrust standing. Rolling v. Dow Jones & Co., 137 Cal.App.3d 709, 723, 187 Cal.Rptr. 797 (1982); see also Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir.2000). Specifically, California Business and Professions Code § 16750(a) confers standing upon "any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless whether such injured person dealt directly or indirectly with the defendant." Cal. Bus. & Prof.Code § 16750(a).
It is true that the definition of "antitrust injury" under California law is less restrictive than the definition found in section 4 of the Clayton Act in that confers antitrust standing on persons who are injured "indirectly" by a defendant's allegedly anticompetitive conduct. Cellular Plus, Inc. v. Superior Court, 14 Cal.App.4th 1224, 1234, 18 Cal.Rptr.2d 308 (1993). The California legislature amended section 16570 to authorize recovery for such indirect injuries in response to Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), in which the Supreme Court held that "indirect purchasers" lacked standing to bring federal antitrust claims. Id.; see also Knevelbaard Dairies, 232 F.3d at 991. Thus, under California law, an indirect purchaser of goods or services is deemed to participate as a customer in the relevant market and thus may suffer a cognizable antitrust injury. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 269 F.Supp.2d 1213, 1224 (C.D.Cal.2003), aff'd, 380 F.3d 1154 (9th Cir.2004), cert. granted, ___ U.S. ___, 125 S.Ct. 686, 160 L.Ed.2d 518 (2004).
At the same time, the standing afforded to indirect purchasers under the Cartwright Act does not permit a court to "dispense with the requirement that an antitrust plaintiff allege an `injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Id. (quoting Morrison v. Viacom, Inc., 66 Cal. App.4th 534, 548, 78 Cal.Rptr.2d 133 (1998)); see also Kolling v. Dow Jones & Co., 137 Cal.App.3d 709, 723, 187 Cal.Rptr. 797 (1982). For this reason, courts interpreting the Cartwright Act's antitrust standing requirement have consistently *1126 followed the "market participant" rule that the court addressed in its discussion of Hummer's Sherman Act claim. See, e.g., Grokster, 269 F.Supp.2d at 1224; Vinci v. Waste Mgmt., Inc. ("Vinci I"), 36 Cal. App.4th 1811, 1816, 43 Cal.Rptr.2d 337 (1995) (citing Solinger II, 718 F.2d at 299). Accordingly, the court's conclusion here is dictated by its preceding discussion of the Sherman Act. The court therefore holds that plaintiffs' motion to dismiss Hummer's Cartwright Act claim is denied to the extent it relies on Hummer's exercise of dominion and control over Napster to establish antitrust injury and granted to the extent that it claims antitrust standing based on unidentified future investments in the online music distribution market.

III. Business & Professions Code § 17200

Finally, Hummer alleges that plaintiffs' conspiracy to restrain trade in the online music business violates California's unfair competition statutes, Cal. Bus. & Prof. Code § 17200 et seq. In moving to dismiss Hummer's unfair competition claims, plaintiffs first argue that the viability of Hummer's counterclaim for unfair competition is based upon its ability to maintain a claim under the Sherman and Cartwright Acts and thus urge dismissal on that ground. This argument is obviously mooted by the court's disposition of Hummer's antitrust claims and thus need not be addressed here.
Alternatively, plaintiffs contend that even if Hummer could prove that their response to the emergence of Napster's file sharing network amounted to unfair competition in violation of section 17200, it has failed to allege any set of facts that would entitle it to any of the remedies available for violations of that statute. As plaintiffs correctly observe, an unfair competition action is equitable in nature, and thus damages are not available to private plaintiffs who bring section 17200 claims. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1144, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) (citing Bank of the West v. Superior Court, 2 Cal.4th 1254, 1266, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992)). Consequently, "prevailing plaintiffs are generally limited to injunctive relief and restitution." Id. (quoting Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal.4th 163, 179, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999)) (original alteration omitted). As to the latter, section 17203 of the Business and Professions Code, which sets forth the remedies for violations of section 17200, provides that restitutionary relief will be available where the court concludes that such relief is "necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. § 17203. In Korea Supply Co., the California Supreme Court addressed the scope of the restitutionary remedy for violations of the unfair competition law. The court held that under section 17203, "an order of restitution is one `compelling a ... defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.'" Id. at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937 (quoting Kraus v. Trinity Mgmt. Servs., Inc., 23 Cal.4th 116, 126-27, 96 Cal.Rptr.2d 485, 999 P.2d 718 (2000)). In other words, "[t]he object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." Id. This purely restitutionary remedy is distinct from "nonrestitutionary disgorgement," which the court defined to include orders to compel the "surrender of all profits earned as a result of an unfair *1127 business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice." Id. at 1144, 131 Cal. Rptr.2d 29, 63 P.3d 937 (quoting Kraus, 23 Cal.4th at 127, 96 Cal.Rptr.2d 485, 999 P.2d 718). The court held that such a remedy is not available under section 17203. Id. at 1147, 96 Cal.Rptr.2d 485, 999 P.2d 718.
Hummer's prayer for relief asserts that it is entitled to "restitution from the plaintiffs for any ill-gotten gains resulting from their unlawful and/or unfair business practices and/or acts of unfair competition." Defs.' Countercl. at 26. However, nothing in the counterclaims suggests that plaintiffs are in possession of funds in which Hummer has an ownership interest. Moreover, while section 17203 allows the victims of unfair competition to seek injunctive relief as well as restitution, Hummer fails to allege that it has suffered any ongoing injury from plaintiffs' anticompetitive conduct. Nor do there appear to be any losses to which Hummer or even Napster itself would be entitled by reason of plaintiffs' gains. Accordingly, the court holds that Hummer has failed to allege any set of facts that would entitle it to restitutionary or injunctive relief under California Business and Professions Code sections 17200 and 17203. The court therefore grants plaintiffs' motion to dismiss Hummer's unfair competition counterclaim.

CONCLUSION
For the foregoing reasons, plaintiffs' motion to dismiss defendants' counterclaims is GRANTED IN PART and DENIED IN PART. The court GRANTS defendants leave to amend their counterclaims to address the deficiencies identified by this order. Defendants may file their amended counterclaims within twenty (20) days of the date of this order. Plaintiffs shall file an answer or a motion to dismiss plaintiffs' amended counterclaims with twenty (20) days of the date that defendants file their amended counterclaims.
IT IS SO ORDERED.
NOTES
[1] Unless otherwise noted, the court draws on the facts alleged in the parties' pleadings.
[2] In fact, it is unclear whether allegations of injury by a prospective shareholder are ever sufficient to establish standing in the Ninth Circuit. Such a conclusion would be consistent with a long line of cases holding that a party does not have antitrust standing simply because its commercial relationship with a market participant gives it an economic interest in avoiding the restraint of the relevant market by a third party. See, e.g., Eagle v. Star-Kist Foods, Inc., 812 F.2d 538, 540-41 (9th Cir. 1987) (holding that fisherman and their union lacked standing to allege injury caused by artificially low prices for tuna because the alleged anticompetitive conduct itself "was directed at the vessel owners, not the crewmembers or the union"); see also Legal Econ. Evaluations, 39 F.3d at 954-56 (holding that consulting firms advising tort plaintiffs about structured settlement annuities are not participants in the market for 0annuities for purposes of the standing inquiry); Exhibitors' Serv., Inc. v. American Multi-Cinema, Inc., 788 F.2d 574, 578-81 (9th Cir. 1986) (holding that film exhibition licensing agent lacked standing to challenge injuries from anticompetitive conduct in market for first-run film exhibitions). Admittedly, the Bubar court conceded that some of the policy considerations on which it based its decision might differ if the court were confronted with a situation "in which a person had all the resources to enter a market and intended to form a solely-owned corporation rather than an individual enterprise." 752 F.2d at 451. But even assuming that this dictum is good law in the Ninth Circuit, it is clear that Hummer's counterclaims fall well short of alleging that it had any intent to participate directly in the market for online music distribution. Thus, regardless of whether the Ninth Circuit would adopt a per se rule barring prospective shareholders in as-yet-to-be-formed corporations from asserting antitrust claims alleging injury to the corporation, the court holds that Hummer's claim to have standing on that basis fails as a matter of law in this action.
[3] It is true that in Solinger I, the Ninth Circuit held that "a prospective purchaser who has taken substantial demonstrable steps to enter an industry and who is thwarted in that purpose by antitrust violations" has standing to bring a private antitrust enforcement action. 586 F.2d at 1309. The court noted that under such circumstances, the antitrust injury determination "is factual in nature and seldom presents a situation appropriate for a determination by summary judgment." Id. at 1310. However, aside from obvious factual differences between Solinger I and the instant caseit is not alleged that Hummer intended to enter the online music distribution business, much less that it took any "demonstrable 0step" in preparation for doing sothe Solinger I court's conclusion was based in part on the since-discredited "target area" test for determining the causal connection between the plaintiff's alleged injury and the anticompetitive conduct of the defendants. Id.; see Associated Gen. Contractors, 459 U.S. at 536 n. 33, 103 S.Ct. 897 (stating that the Court's antitrust injury analysis is intended to replace "target area" test). Thus, for these reasons, as well as those discussed in the text, the court concludes that the "prospective shareholder" analysis in Bubar offer the best guidance for applying current Ninth Circuit and Supreme Court law to the allegations in Hummer's counterclaims.